IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

JARID L. CUBBAGE
   Petitioner,

    v.

THOMAS CARROLL, Warden
   Respondent.

)
)
)
)
)   Civil Action No. 1:05-cv-798 GMS
)
)
)
)
)

APPENDIX IN SUPPORT

OF

MEMORADUM OF LAW



FILED

JAN - 3 2006

U.S. DISTRICT COURT
DISTRICT OF DELAWARE

Jarid L. Cubbage
PRO SE
271683
D.C.C.
1181 Paddock Rd.
Smyrna, De. 19977

DATE: December 22, 2005

# TABLE OF CONTENTS

PAGE

MOTION FOR DISCOVERY — A-1, 6, 10-11

DISCOVERY RESPONSE — A-2, 12

LETTERS TO BARNETT — A-3-5, 7

LETTER TO JUDGE BRADLEY — A-8

LETTERS TO BRADY — A-9, 83

PORTION OF DET. HUDSON'S PRELIMINARY HEARING — A-13-15, 19

POLICE REPORTS — A-16-18, 50, 55-57

PORTION OF WILSON'S TRIAL TESTIMONY — A-20-23, 32-33, 37-38, 43

SIDEBAR CONFERENCE : JUDGE STOKES, MR. ADKINS, MR. BRADY — A-24-25, 27, 66-67, 82

BRADY'S AFFADAVIT — A-26

PORTION OF ADKINS CLOSING ARGUMENTS — A-28-29, 72, 80-81

PORTION OF LEWIS' TRIAL TESTIMONY — A-30, 31, 35-36, 42, 47-48, 59-60, 62

PORTION OF JOHNSON'S TRIAL TESTIMONY — A-34, 39-40, 45, 58, 63

PORTION OF CUBBAGE'S TRIAL TESTIMONY — A-41, 68-69

PORTION OF BLAND'S TRIAL TESTIMONY — A-44, 46

PORTION OF SWAIN'S TRIAL TESTIMONY — A-49

PORTION OF DET. HUDSON'S TRIAL TESTIMONY — A-51-54, 64-65, 70-71, 75-79

PORTION OF COMMISSIONER REPORT AND RECOMMENDATION — A-61

PLEA OFFER — A-73

PRELIMINARY HEARING TRANSCRIPTS COVER PAGE — A-74

PORTION OF BRADY'S OPENING — A-84

*File*

Sussex Correctional Institution
P.O. Box 500
Georgetown, DE 19947

April 5       , 20 02

_____

Office of the Public Defender

_____

_____

Dear Mr. Barnett         :

Please file the motion/s indicated below on my behalf:

(X)     Motion For Discovery
( )     Motion For Dismissal
( )     Motion For Speedy Trial
( )     Motion For Bail Reduction
( )     Motion For Sentence Modification
( )     Motion For Suppression Of Evidence
( )     Other _____
( )     Other _____

## PERSONAL INFORMATION

Name: JARID CUBBAGE         Date of Birth: 5/19/72
Court: Superior Court         County: Kent
Case no. 0202007086
Charges: Robbery 1st   Disguise
         Conspiracy 2nd
         PDWDCF

Your assistance in this matter is greatly appreciated.

Respectfully yours,

SBI#:   00271683

**RECEIVED**

APR 0 6 2002

A-1





**STATE OF DELAWARE**
**DEPARTMENT OF JUSTICE**

M. JANE BRADY
ATTORNEY GENERAL

**NEW CASTLE COUNTY**
Carvel State Building
820 N. French Street
Wilmington, DE 19801
Criminal Division (302) 577-8500
Fax: (302) 577-2496
Civil Division (302) 577-8400
Fax: (302) 577-6630
TTY: (302) 577-5783

**KENT COUNTY**
102 West Water Street
Dover, DE 19901
Criminal Division (302) 739-4211
Fax: (302) 739-6727
Civil Division (302) 739-7641
Fax: (302) 739-7652
TTY: (302) 739-1545

**SUSSEX COUNTY**
114 E. Market Street
Georgetown, DE 19947
(302) 856-5352
Fax: (302) 856-5369
TTY: (302) 856-4698

PLEASE REPLY TO :
    Sussex

**April 25, 2002**

Edward C. Gill, Esquire
16 N. Bedford Street
P.O. Box 824
Georgetown, DE 19947

William Chasanov, Esquire
Brown Shiels Beauregard & Chasanov
10 East Pine Street
Georgetown, DE 19947

Thomas D. H. Barnett, Esquire
512 East Market Street
Georgetown, DE 19947

    RE: **State v. Daron Lewis**
        **ID#0202006645**
        **State v. William J. Wilson**
        **ID#0202006649**
        **State v. Jarid L. Cubbage**
        **ID#0202007080**

Dear Gentlemen:

    Pursuant to Superior Court Criminal Rule 16, the following information concerning the above captioned case is being supplied:

    Rule 16(a)(1)(A): Relevant written, recorded or oral statements made by defendant or any juvenile or adult co-defendant in response to interrogation by a person then known by the defendant to be a state agent:

    Defendants, Lewis, Wilson, and Cubbage made statements that were audio recorded, which are available for your inspection at a mutually convenient time. If you prefer, please forward three (3) blank tapes and copies will be made and forwarded to you.

A-2-(a)

State v. Daron Lewis
State v. William Wilson
State v. Jarid Cubbage
April 25, 2002
Page - 2 -

See enclosed copies of the following police reports:

Det. Hudson's Initial Crime Report, dated February 9, 2002
Cpl. Hall's Supplement Report, dated February 19, 2002
Det. Hudson's Supplement Report, dated February 20, 2002
Det. Bethard's Supplement Report, dated February 11, 2002
Sgt. Swain's Supplement Report, dated March 8, 2002

Rule 16(a)(1)(B):  Defendant's Prior Record.

Enclosed is a copy of defendants' Lewis, Wilson and Cubbage known criminal history record information as same is maintained in the Attorney General's Office Case Tracking System.  Although this is the single best source of such data available within the State, I caution you that such information is occasionally incomplete or inaccurate.  I therefore suggest that you discuss this matter with your client who should be able to correct erroneous data and complete the record as needed.  In addition, I intend to discuss any discrepancies with you prior to trial.

I          Rule 16(a)(1)(C):  Documents and Tangible Objects.

Inspection of documents and tangible objects will be permitted upon reasonable notice and during normal business hours.  Please contact my office to arrange for a mutually convenient time for inspection.  This evidence includes, but is not limited to crime scene video, photos and items seized from 1998 Toyota.  See enclosed copy of application, affidavit and return re:  search of 1998 Toyota.

Rule 16(a)(1)(D):  Reports of Examinations and Tests.

Results or reports of mental or physical examinations and scientific tests or experiments which the State intends to use during its case-in-chief, or material to the defense:

See enclosed copy of Sgt. Swain's report for results of latent fingerprint collection and comparison.

Rule 16(a)(1)(E):  Expert Witnesses.

The identity and substance of the opinions of expert witnesses:

None at this time.

A-2(b)

State v. Daron Lewis
State v. William Wilson
State v. Jarid Cubbage
April 25, 2002
Page - 3 -


Please be advised that this response, together with any acknowledgments of information to be supplied when received, constitute the State's entire response to its discovery obligations under Rule 16 and/or any written request filed by the defendant. If, prior to or during trial additional evidence or material is discovered which is subject to discovery shall be disclosed immediately. Further discovery, except to the extent referred to herein is objected to as being outside the scope of the State's obligation under Rule 16. Should you wish to pursue the matter further, please file a motion to compel further response as provided by Rule 16.

State's Reciprocal Discovery Request:

Pursuant to Superior Court Criminal Rule 16(b), please provide me with the following:

1. An opportunity to inspect and copy or photograph any books, papers, documents, photographs, tangible objects or copies or portions thereof, which are within the possession, custody, or control of the defendant, which the defendant intends to introduce as evidence in chief at the trial.

2. An opportunity to inspect and copy or photograph any results or reports of physical or mental examinations and of scientific tests or experiments made in connection with the particular case, or copies thereof within the possession or control of the defendant, which the defendant intends to introduce as evidence in chief at trial or which were prepared by a witness whom the defendant intends to call at the trial when the results or reports relate to that witness' testimony.

3. Disclosure of any evidence the defendant may present at trial under Rules 702, 7.03 or 705 of the Delaware Uniform Rules of Evidence, including the identify of the witness and the substance of the opinions to be expressed.

Please be advised that your failure to respond will be presumed to mean that you have no materials discoverable under Rule 16(b) and that the State will rely upon that presumption.

**SEE ENCLOSED COPY OF WRITTEN PLEA OFFER.**

Sincerely yours,

James W. Adkins
Deputy Attorney General

cc: Prothonotary
    file

JWA:jyj

A-2(c)

RECEIVED

MAY 20 2003



5-5-02

Mr. Barnett:

I'm writing to you for a couple of reasons. I was wondering if you received the confession and statement audio tapes. Also did you receive a tape or written confession of William Wilson. There is an inmate by the name of Elwood Willis who was on the tier with Daron & William and they told him that they were planning to put everything on me. He has an letter written up but he has to get it notarized at the law library. I forgot to give you a couple of other people to talk to in regards of the operation of the safe and how much money is in it. Tim Miller who is Burger King's Area Manager. His work number is (302) 628-2699 or you could call Pat at Killian Ent. or Inc. I don't know the number but it might be listed in the phone book or you could get it from Tim or Pam. She can fax you one of Burger Kings daily cash sheet that has the safe count on it. I'll have my wife look for the number also. There are other issues that I would like to discuss but I'll wait until we speak in person.

Thank-you

A-3

RECEIVED

MAY 29 2002

5-26-02

A-4

Mr. Barnett,

    I'm writing for a few reasons. First, have you received the transcript of William Wilson's confession? If so, could you please send a copy of it to me. I also need a copy of Sgt Swain's report on Criminalistics Service report #62-47. The copies that I have the words are cut off on the left hand side. I need to know how and how the other stuff was collected. Remember our brief discussion about how Mike knew it was a male and Sandra Watson's testimony at the preliminary hearing that Mike simply knew it was a male. Mike did hear the voice of the third suspect cause he told Pam, the store manager. When I came to work on Sat, Feb. 9th at 12:00pm she asked me where I was that night and after I told her she asked me ~ David Collins, William Wilson's cousin ~ which one of Billys & Darons is ... young, brown skin and a large nose. Plus he told Stephanie Whaley & Louisa Cenat that Daron or Billy could have stolen the key from my keychain because they were always driving or using my car. A guy by the name of Ralph Finney, Carlos Rodriguez and Chaundra White (pronounced sandra) were present when Pam asked me & Dave. Letetia Besset, he goes by the name of Tish was also there but I can't remember is she was present. I'm trying to get Ralph Finney's phone number so you can ask him some questions. I have Chaundra -ouisa and Stephanie's number and I will send them in the end of the letter. I really don't know if Pam is going

File

Mr. Barnett:

I am writing so that you can file these motions on my behalf. The first motion I need filed is one that will get me William Wilson's allege confession and the second motion is a return of property. Since Detective Hudson testified at the preliminary hearing that they had no physical evidence then the items he seized from my car along with my house keys should be returned to me and my wife.

Thank you

Items Seized
- house keys
- red wavecap (doorag)
- black wavecap (doorag)
- light blue wavecap (doorag)
- dark blue wavecap (doorag)
- pair of black gloves
- black t-shirt
- black pullover shirt
- (1) black glove
- pair of Reebok sneakers (white)

RECEIVED
JUL 30 2002

A-5

Smyrna, DE  19977

OFFICE OF THE PUBLIC DEFENDER
~~XXXX XXXX XXXX~~ 530 south state st.
Dover, DE  19901

DEAR Mr. Thomas Burnett,

PLEASE FILE THE MOTION(S) INDICATED BELOW IN MY BEHALF:

(X) MOTION FOR DISCOVERY - RULE 16 Transcript of William Wilson's
                                    Confession

( ) MOTION FOR SPEEDY TRIAL

( ) MOTION FOR REDUCTION OF BAIL

( ) MOTION FOR SUPPRESSION

( ) MOTION TO DISMISS - FAILURE TO INDICT, FAILURE TO PROSECUTE

( ) MOTION FOR REDUCTION OF SENTENCE

( ) NOTICE OF APPEAL

( ) MOTION FOR BILL OF PARTICULARS

(X) OTHER: Motion for Return of Property

PERSONAL INFORMATION:

NAME: David Cubbage          AKA: _____

SBI # 271683                 DOB: 5-19-72

CASE NUMBERS: 0202007086 _____ _____

CHARGES Robbery 1st   Disguise   Conspiracy 2nd

PDWDCF _____

I APPRECIATE YOUR FILING THESE MOTIONS IN MY BEHALF.

THANK YOU.

SINCERELY YOURS,

DATE: 7-29-02

FORM PDDCCKC.OFM

A-6

Fib

6·3·02

Mr. Barnett:

I was just writing you to inform you that I have written Prosecutor Adkins requesting the transcript of William Wilson's statement and the list of the State's witnesses who will be testifying against me at trial.

RECEIVED

JUN 05 2002

A-7

Your Honor:

My name is Jarid Cubbage. I'm writing to you to see if you can help me with a situation. I filed a rule 16: motion for discovery but Prosecutor Atkins has not sent me the confession of my allege co defendant or the list of witnesses that will testify against me at trial. I wrote him a letter asking for those items and a new copy of the evidence technician report by Sgt. Swain cause the one that was sent to me had a lot of words missing and chopped of on the left hand side. I have to guess at what the sentence might be when I read the copy I have. I'm three weeks from trial and I want to be prepared with no surprises.

Thank-you

Jarid Cubbage
271683 DCC
1181 Paddock Rd
Smyrna, De. 19977

H-8

Mr. Brady:

I'm writing to you so that you can get a better feel of what I expect of you and my situation. Do not take this the wrong way but I don't trust this whole situation I am in. I had an attorney for seven months and all of a sudden you are my attorney and you were going to go to trial just four days after taking over my case. Then the incident with Prosecutor Gelof didn't sit to well with me at all. That put doubt in my mind about you looking out for the best interest of your client. I asked around about your credentials and only a few people have heard of you and they all gave negative statements about you. What was told to me by these other people only added strength to my own opinion that I based on the two days that we talked. I couldn't find your name in the phone book, you didn't give me a card or anything with your address on it. I had to get it from Lamar Hopkins. I don't want you to think that I'm putting you down or anything. My life is on the line and I need someone I can trust and not trying to get the State another conviction. As long as I've been in the system, it has always been mentioned that the Public Defender or Court Appointed works for the state. I just want the person appointed to represent me to fight for me just as they would fight for themself or their children. Everyone wants justice even the accused but justice isn't always about finding a culprit or convicting a culprit, it's about finding out the truth. And no one on the State's side is telling the truth. I need you to file the five motions I have enclosed with this letter. I'm going to tell you the same as I told Mr. Barnett. I'm not taking no one else's robbery or weapons charges. I was trying to get Barnett to resolve the issue before trial because I didn't want my wife to find out I was having an affair but like I said I refuse to

to take another man's charge and I'll take the chance of my w.
finding out about my infidelities. I know there is an irreconcilable
conflict in the State's case concerning my guilt. The evidence
collected by Sgt. Swain and Det. Hudson contradicts every witness
statement. Not to mention Daron lying in his confession three or more
times. Like I wrote to Burnett, his credibility is worthless and any
decent lawyer would attack it from start to finish. The State woul
be crazy to jeopardize the case to put him on the stand as their
case in cheif. After the State rest their case, I'm asking for
a judgement of acquittal. If I'm still found guilty, I'll figh
it on appeals and also ineffective assistance of counsel. Another
thing, every manager at Burger King has to write down on a cash
daily sheet the amount of their shift's deposit, the amount of mone
in the safe (Start up money) and the time they counted the safe.
Burger King safe is exactly $1500 dollars not $522 dollars. Mike told
Det. Hudson at 3:05 Am on Saturday 2-9-02 that the safe was
approximately $522 dollars but if you check the daily cash sheet,
it's going to say that the safe is $1500 dollars. How is he going
to log on paper one thing and tell Det. Hudson another? It was
only two hours after he allegedly did the paperwork for the night.
The safe is the last thing to be counted when doing paperwork. How
could he tell the detective the exact amount of money taken from the
safe before anyone or the morning manager realized the money was
missing? You will see what I'm talking about when you get
the cash daily sheet, I need you to send me a copy of the
police report, William Wilson's confession or statement and a copy
of all the questions I sent to Burnett for Det. Hudson, Mike
Johnson, Daron Lewis, Jason Beall, William Wilson and Paw
Bland and their inconsistent statements. I need you to file
the five motions that I have enclosed with the letter and the
special subpoena to receive the daily cash sheet for 2-8-02

The State is trying to convict me on what I knew as a manager and who I knew. Evidence don't lie, people do and Daron lied and said I was involved to take the heat off of him. I would like to see you in person before I go to trial so that we may discuss strategy for my defense. There is a lot more information and questions that can help open up the case. I hope to hear from you soon. Please respond to my letters, one I do not wish to be left in the dark about anything cause this is my life and freedom I'm fighting for.

Thank you

Ex.

A-9

NAME: _____ 271683
De ware Corr. Center
Smyrna, DE  19977

OFFICE OF THE PUBLIC DEFENDER
1 South Race Street
Georgetown, DE  19947

DEAR _John Brady_____,

      PLEASE FILE THE MOTION(S) INDICATED BELOW IN MY BEHALF:

(X)   MOTION FOR DISCOVERY - RULE 16   Police report - Statements of victims
                                       and suspect's statements

( )   MOTION FOR SPEEDY TRIAL

(X)   MOTION FOR REDUCTION OF BAIL

(X)   MOTION FOR SUPPRESSION

( )   MOTION TO DISMISS - FAILURE TO INDICT, FAILURE TO PROSECUTE

( )   MOTION FOR REDUCTION OF SENTENCE

( )   NOTICE OF APPEAL

( )   MOTION FOR BILL OF PARTICULARS

(X)   OTHER: _Motion for return of property_

      **PERSONAL INFORMATION:**

NAME: _David Cubbage - 271683_   AKA: _____

SBI # _271683_                   DOB: _5-19-72_

CASE NUMBERS: _0202007080_  _____  _____

CHARGES _Robbery 1st   Conspiracy 2nd   Wearing disguise
during Commission of Felony   PDWDCF_

      I APPRECIATE YOUR FILING THESE MOTIONS IN MY BEHALF.

      THANK YOU.

                                     SINCERELY YOURS,

DATE: _9-9-02_____

FORM PDDCCKC.OFM

A - 10

NAME: _David Cobbage_

De_ _are Corr. Center
Smyrna, DE  19977

OFFICE OF THE PUBLIC DEFENDER
1 South Race Street
Georgetown, DE  19947

DEAR _John Brady_____,

    PLEASE FILE THE MOTION(S) INDICATED BELOW IN MY BEHALF:

( )  MOTION FOR DISCOVERY - RULE 16

( )  MOTION FOR SPEEDY TRIAL

( )  MOTION FOR REDUCTION OF BAIL

(X)  MOTION FOR SUPPRESSION /Evidence Hearing

( )  MOTION TO DISMISS - FAILURE TO INDICT, FAILURE TO PROSECUTE

( )  MOTION FOR REDUCTION OF SENTENCE

( )  NOTICE OF APPEAL

( )  MOTION FOR BILL OF PARTICULARS

(X)  OTHER: _Motion to be permitted to listen to tape recordings made by police of Statements of co defendant William Wilson and inspect written record of such tape_

**PERSONAL INFORMATION:**

NAME: _David Cobbage_____    AKA: _____

SBI # _271683_____    DOB: _5-18-72_____

CASE NUMBERS: _0202007080_ _____ _____

CHARGES _Robbery 1st  Conspiracy 2nd  Wearing disguise during_
_Commission of a felony  PDWDCF_____

    I APPRECIATE YOUR FILING THESE MOTIONS IN MY BEHALF.

    THANK YOU.

                          SINCERELY YOURS,

DATE: _9-9-02_____

FORM PDDCCKC.OFM

A-11





M. JANE BRADY
ATTORNEY GENERAL

**STATE OF DELAWARE**
**DEPARTMENT OF JUSTICE**

| NEW CASTLE COUNTY | KENT COUNTY | SUSSEX COUNTY |
|---|---|---|
| Carvel State Building | 102 West Water Street | 114 E. Market Street |
| 820 N. French Street | Dover, DE 19901 | Georgetown, DE 19947 |
| Wilmington, DE 19801 | Criminal Division (302) 739-4211 | (302) 856-5352 |
| Criminal Division (302) 577-8500 | Fax: (302) 739-6727 | Fax: (302) 856-5369 |
| Fax: (302) 577-2496 | Civil Division (302) 739-7641 | TTY: (302) 856-2500 |
| Civil Division (302) 577-8400 | Fax: (302) 739-7652 | |
| Fax: (302) 577-6630 | TTY: (302) 739-1545 | |
| TTY: (302) 577-5783 | | |

PLEASE REPLY TO :
Sussex County Office                            September 27, 2002

John F. Brady, Esquire
P.O. Box 251
Georgetown, DE 19947

> RE:   State v. Jarid L. Cubbage
>        ID #0202007080
>        Cr. A. #S02-02-0611 thru 0613; S02-03-0268

Dear Mr. Brady:

It is my understanding that when you were substituted as counsel for the defendant in the place of Thomas Barnett, Esquire, you were provided the entire file from Mr. Barnett, which would have included the State's complete discovery package, dated April 25, 2002. Despite the fact that said formal discovery invited defense counsel to arrange a time to listen to audio tapes of the defendant or provide blank tapes, so that we could forward copies to defense counsel, I have heard nothing from defense counsel on this subject and; therefore, I am choosing to go ahead and provide copies of these audio tapes to you today. Please find enclosed copies of the following audio tapes:

1. Interview of Co-Defendant, Daron Lewis (2 tapes).
2. Interview of Co-Defendant, William Wilson.
3. Interview of Defendant, Jarid Cubbage.

In addition, please be advised that Det. Doug Hudson did an untaped oral interview of Co-Defendant, William Wilson, in the presence of his attorney, Mr. William Chasanov, on his preliminary hearing date, February 21, 2002, in which William Wilson admitted his involvement in the subject robbery and substantially corroborated the version given by Co-Defendant, Daron Lewis. The main inconsistency between Lewis and Wilson is that they each claim the other one had the gun.

Although it is my recollection that Mr. Barnett was present on the court dates that Co-Defendants, Lewis and Wilson entered pleas of guilty and we fully discussed their deals, I enclose for your review the following:

A-12(a)

John F. Brady, Esquire
September 27, 2002
Page 2

1. Copy of written plea agreement where Co-Defendant, Lewis pled guilty on May 6, 2002, and the sentencing order, dated June 28, 2002.

2. Copy of written plea agreement where Co-Defendant, Wilson pled guilty on April 29, 2002, and the sentencing order, dated June 14, 2002.

I also enclosed herein, in advance of trial, the following "Jencks material":

1. Copy of audio taped interview of victim/witness - Michael Johnson;
2. Copy of audio taped interview of victim/witness - Jason Baull.

Finally, please find enclosed copies of motor vehicle and criminal records for witnesses: Jason Baull, Pamela Bland, and Michael Johnson. The records for Co-Defendants Lewis and Wilson should be in the previously mentioned April 25th discovery package.

I once again invite defense counsel to view all physical evidence in this case prior to trial, by calling me to arrange a convenient time.

Yours truly,

James W. Adkins
Deputy Attorney General

JWA:cjw

Enclosure

cc: Prothonotary's Office
    File

A-12(b)

7

1      A.      Yes.  I can't remember the date.  But I believe it as

2  the fourteenth of February — I'm sorry, it was the twelfth of February.  I

3  responded to West Rehoboth with Mr. Lewis, he showed me a car, looked

4  underneath, it was a gold broken-down Cadillac Cimmiron, under the left rear

5  wheel I located a Marksmen BB gun and a aluminum, black aluminum baseball

6  bat.

7      Q.      Okay.  Prior to that day, had you had an

8  opportunity to speak with the other codefendant, Mr. Wilson?

9      A.      Yes, I did.

10      Q.      And what did he tell you?

11      A.      Mr. Wilson told me just about the exact same story

12  as Mr. Lewis.

13      Q.      Did he also tell you that Mr. Cubbage --

14      A.      Yes, sir.

15      Q.      -- was involved in this?

16      A.      Yes, sir.  He, as well as Mr. Lewis, stated that Mr.

17  Cubbage was the third codefendant.

18      Q.      Do you see Mr. Cubbage here in the courtroom—

19      A.      Yes, sir.

20      Q.      This morning?

21      A.      He's seated next to Mr. Barnett in the white suit.

22      Q.      Okay.  I might have missed this when you were

23  detailing the facts of this incident, but did you also find out that there was money

LINDA A. LAVENDER
Official Court Reporter   A - 13

1      BY MR. BARNETT:

2                    Q.      You said that you talked originally with Mr. Lewis?

3                    A.      Yes, sir.

4                    Q.      And then when did you talk to Mr. Wilson, I'm

5      sorry I didn't get that down?

6                    A.      I believe it was last week.

7                    Q.      Last week?

8                    A.      Here, while here at preliminary hearing.

9                    Q.      While at his preliminary hearing?

10                   A.      Yes, sir.

11                   Q.      Are you aware that Mr. Lewis and Mr. Wilson are

12     on the same tier at SCI?

13                   A.      I don't know, sir.

14                   Q.      Okay.   Are you aware of whether or not there's

15     any no contact order between those two parties?

16                   A.      I don't know, sir.

17                   MR. BARNETT:  Thank you.

18                   MR. ADKINS:   I have no further questions.

19                   THE COURT:   Thank you, Mr. Barnett.  You may step

20     down.  Thank you.

21                   THE WITNESS:   Yes, sir.

22                   (WHEREUPON, THE WITNESS STEPPED DOWN).

23                   MR. ADKINS:   The State rests.

                     LINDA A. LAVENDER
                     Official Court Reporter

A - 14

1        A.        I don't think so, sir.

2              (PAUSE).

3              THE COURT:    Anything further, Mr. Barnett?

4              MR. BARNETT:    If I could have a moment, Your Honor, I'm

5    trying to look through the report here.

6              (PAUSE).

7    BY MR. BARNETT:

8        Q.        So, was the gun and the bat tested for any sort of

9    fingerprint evidence?

10        A.        It's in the process of that now, sir.  I don't know if

11    it's been done yet.

12        Q.        Okay.  And so the only evidence that you really

13    have against Mr. Cubbage is the statements by the two codefendants; is that

14    correct?

15        A.        Yes.  Plus that matches up with the only people at

16    the crime scene would have known certain elements of what happened if they

17    were there.

18        Q.        You are circumstantially correct, but as far as any

19    physical evidence or any identification the only thing you have are the

20    codefendants' statements; correct?

21        A.        Yes, sir.

22              MR. BARNETT: No further questions.  One more, Your

23    Honor, I'm sorry.

LINDA A. LAVENDER
Official Court Reporter        A - 15

02/19/2002        Troop 7 State Police                    07-02-004670

Supplemental Report - #2

| Original Occurrence Dates and Times: | Grid | Sector | |
|---|---|---|---|
| SAT 02/09/2002 0100 thru SAT 02/09/2002 0115 | 204-114 | 73 | |

Original Location:
**4545 HIGHWAY ONE BURGER KING RESTAURANT**    Rehoboth Beach, DE 19971
STATE ROUTE 1 2 MILES NORTH OF REHOBOTH

### Investigative Narrative

I responded to a residence on SR5 just north of CR 255 by request of Troop 4 to apprehend William Wilson.  Upon arrival I contacted and arrested Wilson.

I advised Wilson of his Miranda Rights at approximately 1345hrs, but I did not interview him.

I transported Wilson to Troop 4 where he was turned over to Det. Hudson.

Wilson made no statements to him in reference to this incident.

A - 16

| Reporting Officer | | Supervisor Approval | | | |
|---|---|---|---|---|---|
| CPL HALL  - 5920 | | BRIAN E CONLIN  PSPT017  Date 02/19/2002 2055 | | | |
| Solvability Factors | ☐ Witness | ☐ M. O. | ☐ Trace Stolen Property | ☐ Suspect Named | Status |
| | ☐ Suspect Located | ☐ Suspect Described | ☐ Suspect Identified | ☐ Suspect Vehicle Described | **Closed** |

Investigative Narrative - Continued

ne manager of the Burger King and she was called in upon hearing of the Robbery. Ms. Bland
upplied me with the employment history of Daron Lewis and William Wilson. Daron Lewis worked
t the Burger King from 071100 to 122201. William Wilson worked at the Burger King from 062300
ɔ 121301.

I later conducted CJIS inquiries on Daron Lewis and William Wilson and learned that their
escriptions were similar to what the victims described.

I then obtained warrants for Defendant William Wilson and Defendant Daron Lewis from JP 3. I
lso contacted Lt. Tim Winstead of the Public Information Office and gave him the facts of the
ncident, along with the fact that I had warrants for Daron Lewis and William Wilson. He put
ut a news release. I later made attempts to locate Daron Lewis and William Wilson, with
egative results.

On 020902 at approximately 0700 hrs. I responded back to the Burger King Restaurant and
econtacted Ms. Pamela Bland. She advised that when she opened the safe to get the start up
oney for the day, she discovered that all of the money was missing from the safe. Refer to her
ttached statement for details.

I then responded to the ▮▮▮▮▮▮▮ in ▮▮▮▮▮▮▮ and recontacted Victim Michael Johnson and
sked him about locking the safe. He was certain that he locked the safe and denied taking any
f the money from the safe. Refer to his attached statement. At that point, it was unknown how
he money was taken from the safe.

On 021002 at approximately 1030 hrs. I was contacted by telephone by Sgt.
Williams of DSP 4. He advised that Defendant Daron Lewis turned himself into DSP 4 upon hearing
hat he was wanted.

On 021002 at 1100 hrs. I interviewed Defendant Daron Lewis at DSP 4. Refer to his attached
tatement, as well as the audio tape of the interview for the exact dialogue. During the
nterview, Defendant Daron Lewis admitted to being involved in the Robbery. He also gave a
ull confession about the incident and he named Jarid Cubbage as the third suspect. He also
nformed me that Jarid Cubbage was an assistant manager at the Burger King. At that time, I
ealized how the money was removed from the safe. Jarid went into the restaurant to retrieve
he money, and he opened the locked safe and took the money.

I later obtained warrants for Defendant Jarid Cubbage from JP 3.

On 021002 at approximately 1330 hrs. I was contacted by Sgt. Brian Conlin of DSP 7. He
dvised that Defendant William Wilson called DSP 7 and wanted to turn himself in. He further
dvised that Cpl. David Hall of DSP 7 was responding to the Milton area to take Defendant Wilson
into custody.

On 021002 at 1400 hrs. Defendant William Wilson was brought into DSP 4 by Cpl. David Hall.
Refer to his supplement for the details of his actions.

On 021002 at 1405 hrs. I interviewed Defendant William Wilson at DSP 4.

Refer to his attached statement, as well as the audio tape of the interview for the exact

| Reporting Officer | Supervisor Approval | |
|---|---|---|
| DET. HUDSON  - 4216 | CHARLES C BROWN PSPT560 Date 02/27/2002 1239 | A - 17 ⸂ a⸃ |

dialogue. Defendant Wilson made no statements.

On 021002 at 1500 hrs. I responded to the Burger King Restaurant and took Defendant Jarid Cubbage into custody without incident.  He  was an assistant manager there, and had just began his work shift at 1500 hrs. Upon contacting Defendant Cubbage, he was behind the counter near one of the cash registers.

He was dressed in a Burger King uniform, and he had a large set of keys in his pants pocket.  I then removed the keys and took possession of them.

Defendant Cubbage was  then taken to DSP 4 by Tfc. Windish of DSP 7.

Defendant's vehicle (a  1998 Toyota Camry DE. Reg 194705, gold in color) was parked on the north side of the Burger King.  It was subsequently towed to DSP 4 as evidence.


While I was conducting this portion of the investigation, Det. Bethard of DSP 4 processed Defendant Daron Lewis and Defendant William Wilson.  They were committed to SCI in default of bond.  Refer to Det. Bethard's supplement for details.


On 021002 at 1515 hrs. I contacted  Ms. Pamela Bland at the Burger King.  She was called in upon Defendant being arrested.  She confirmed that keys to the Burger King resturant, the Burger King safe and the Burger King bank deposit box were on the key ring.  Ms. Bland also confirmed that Jarid knew the combination to the safe.


On 021002 at approximately 1530 hrs. I responded to Norwood Street in West Rehoboth and attempted to locate the B.B. gun, which Defendant Daron Lewis told me about.  I could not locate the gun.


On     021002 at 1550 hrs. I contacted Victim Michael Johnson at the Burger King.

He talked about a threatening phone call he received from Defendant Cubbage.

Refer to Victim Michael Johnson's attached statement.

On 021002 at 1700 hrs. I interviewed   Defendant Jarid Cubbage at DSP 4.  Refer to his attached statement, as well as the audio tape of the interview for the exact dialogue.  He made no admissions.


On 021102 I obtained a search warrant for Defendant Cubbage's vehicle. A 1998 Toyota    Camry gold in color, DE Reg. 194705.


On 021102 at 1500 hrs. I executed the search warrant on Defendant Cubbage's vehicle.  The following items were seized:


Located in trunk--1 red/white bandana, 1 black bandana, 1 pair of white Rebok sneakers.

Located in rear seat--1 black t-shirt, 1 black golf type shirt, 1 black glove.

A - 17(b)

| Reporting Officer | Supervisor Approval |
|---|---|
| DET. HUDSON  - 4216 | CHARLES C BROWN PSPT560 Date 02/27/2002 1239 |

## Statement of Victim 002 - MICHAEL JOHNSON - Continued

I asked Mr. Johnson to estimate on a scale of one to ten how sure he was of Daron Lewis' and William Wilson's identity. He stated that he was a ten because he had worked with both of them at Burger King. He added that at one point, he heard someone say 'Daron watch yourself.' Refer to the audio tape of the interview for the exact detail.

On 021002 a short time after 0700 hrs. I responded to the ███████ and recontacted Mr. Johnson and asked him about the money missing from the safe.

Mr. Johnson was positive that he locked the safe and stated that he did not take any of the money from the safe.

On 021002 at 1550 hrs. I recontacted Mr.     Michael Johnson at the Burger King.

He advised that at 1440 hrs. he received a phone call from Jarid Cubbage, and that Jarid told threatened to hurt him for telling on him.

---

## Statement of Suspect 001 - DARON LEWIS

On 021002 at 1100 hrs. I interviewed Daron Lewis at DSP 4. He was advised of Miranda before any questioning. During the interview, Mr. Lewis admitted to being involved in the Robbery at the Burger King on 020902. Mr. Lewis stated that he and    William Wilson went riding around with Jarid Cubbage, in Jarid's car on the evening of 020802. Mr. Lewis added that Jarid's car is a gold Toyota Camry. Mr. Lewis stated that while they were riding around, Jarid talked about 'getting the Burger    King.' I asked Mr. Lewis what that meant, and he stated that Jarid was talking about robbing the Burger King.

Mr. Lewis later stated that Jarid later parked his car in the parking lot of the Dollar General store, which is located on State Route 24 behind the Burger King, and he, Jarid Cubbage and William Wilson got out and walked up to the rear of the Burger King. He added that he had the bat and William Wilson had the gun, which was a B.B. gun. Mr. Lewis then stated a while later, a    person exited the rear door of the Burger King with the trash and William ran up to him and grabbed him and told him to call the manager outside. Mr. Lewis then stated that when 'Mike' the manager came outside, he went to him and they took both of them to the dumpster area and closed them in there behind the gate. Mr. Lewis stated that Jarid went inside the restaurant and retrieved the money. Mr. Lewis told me a short time later that Jarid was an assistant manager of that Burger King. Mr. Lewis then stated that upon exiting the Burger King, he, Jarid Cubbage and William Wilson went back to Jarid's car and they drove to West Rehoboth and he threw the B.B. gun under a disabled car in West Rehoboth. He also stated that they all wore    gloves during the incident and that Jarid and William had masks on, and that they put everything, except for the B.B. gun, in the trunk of Jarid's car. Mr. Lewis stated that after leaving West Rehoboth, they drove to an unknown location in    Salisbury, MD and Jarid left the money with a female named Josel. Refer to the audio tape of the interview for the exact dialogue.

On 021202 at 1245 hrs. I contacted Mr. Lewis at SCI and inquired about him taking me to West Rehoboth to show me    where he placed the B.B. gun. At that time, he agreed to show me and I drove him to West Rehoboth. Mr. Lewis then directed me to 114 Duffy Street and he pointed to to a disabled Cadillac Cimeron, which was parked in the front yard. Mr. Lewis then told me that the B.B. gun and the bat were under the car, near the left rear wheel.

A - 18

| Reporting Officer | | | Supervisor Approval | | | | |
|---|---|---|---|---|---|---|---|
| DET. HUDSON - 4216 | | | CHARLES C BROWN PSPT560 Date 02/27/2002 1239 | | | | |
| Solvability Factors | ☐Witness | ☐M. O. | ☐Trace Stolen Property | ☐Suspect Named | | Status | |
| | ☐Suspect Located | ☐Suspect Described | ☐Suspect Identified | ☐Suspect Vehicle Described | ◆ | Closed | |

8

1    taken from a location where an individual would have had to have a key and a

2    combination or something of that effect?

3                        A.        Yes, sir.  After, when I interviewed Mr. Johnson,

4    he stated he took the money out of the registers, put 1,400 — I think it was

5    fourteen hundred and seven bucks, in the night deposit bag, took the other $522

6    put it in the safe as the start-up money for the next day.  He said he locked the

7    safe with the key and a combination and the next morning, Miss Pamela Bland,

8    which is the manager of the store, notified me that the money was missing from

9    the safe, too.

10                        At that point in time we couldn't understand how the money

11    could have been taken.  So, once I interviewed Mr. Lewis and realized that Mr.

12    Cubbage, who was an assistant manager there, that explained why the money

13    was gone, because Mr. Lewis told me that Mr. Cubbage was the one that went

14    inside the restaurant when he and Mr. Wilson took the two victims back to the

15    dumpster area.  That explains that because I know for sure that Mr. Cubbage

16    knew the combination to the safe and as well as I confirmed that he had a key.

17                        Q.        Okay.  And did you also, you also discussed in

18    your testimony whether any or all three were wearing a disguise on the occasion

19    of this offense and what kind of disguise?

20                        A.        Yes.  Mr. Lewis stated they had on all black

21    clothing and had a shirt over his face.  Said that Mr. Wilson and Mr. Cubbage

22    had on black, possibly neoprene type ski masks.

23                        Q.        Okay.  And did these versions coincide with the

LINDA A. LAVENDER
Official Court Reporter                A-19 (a)

1     victims' version to you?

2                          A.        Yes, sir.

3                          MR. ADKINS:   Okay.  I have no further questions, Your

4     Honor.

5                          THE COURT:   Thank you very much.  Mr. Barnett, you may

6     cross-examine.

7                          MR. BARNETT:   Thank you, Your Honor.

8                          MR. ADKINS:   Your Honor, I will do one thing here at the

9     end of our presentation, and that is bond discharge the Possession of a Firearm

10    During the Commission of a Felony.

11                         THE COURT:   Yes, sir.

12                         MR. ADKINS:   It was found out to be a beebee gun and

13    from my review of the statute, although they did display what appeared to be a

14    gun -- so I'm not bond discharging the Robbery First, I don't think it's going to

15    qualify as a firearm, so I am going to bond discharge the Possession of a

16    Firearm during the Commission of a Felony.

17                         I only do it at this point to save us some time in case Mr.

18    Barnett was going to zero in on that point with a lot of questions.

19                         THE COURT:   Well, that is good, that is economical.   So

20    we'll enter it now then.

21                         In Jarid Cubbage, it's 020486, Possession of a Firearm

22    During the Commission of a Felony, the bond is discharged on that complaint

LINDA A. LAVENDER
Official Court Reporter
A-19(b)

WILSON - Direct

1      Q    The other two get out of the car?

2      A    Yes, sir.

3      Q    What did you do?

4      A    We walk.

5      Q    Step-by-step, what did you do there at the

6   car?

7      A    We put on our disguises, like halfway on,

8   and then we walked over to the little restaurant

9   before Burger King.

10     Q    Did you have anything covering part of your

11  face?

12     A    No, not walking to the store.

13     Q    During the incident at the store, did you

14  have something covering part of your face?

15     A    Yes, sir.

16     Q    What was that?

17     A    A red and white doo-rag.

18     Q    What is a doo-rag?

19     A    It's like a bandana.

20          MR. ADKINS:  Your Honor, I would like to

21  have this marked as the next letter exhibit for I.D.

22          THE CLERK:  Marked as D for State's I.D.

23

CHRISTINE L. QUINN
OFFICIAL COURT REPORTER

A - 20

WILSON - Direct

1  BY MR. ADKINS:

2      Q    Mr. Wilson, I'm going to hand you what is

3  marked State's D for I.D.  I want you to take a look

4  at this.  Do you recognize that?

5      A    Yes, sir.

6      Q    What is it?

7      A    The disguise I had on when I committed the

8  crime.

9      Q    How did you have that on when you say "as

10  you committed the crime"?

11     A    On my face.  Like you could see my eyes, but

12  you couldn't see like the other part of my face.

13     Q    Now do you remember what route or path you

14  took, the three of you, to get over to the Burger

15  King?

16     A    We went through a little housing development

17  that is right behind the Dollar Store, and we stood

18  behind this little restaurant.  I forgot -- I think

19  it's called Cafe Italiano.

20     Q    What, if anything, were you carrying with

21  you?  Were you carrying anything?

22     A    No, sir.

23     Q    Do you know if Daron Lewis was carrying

CHRISTINE L. QUINN
OFFICIAL COURT REPORTER

A-21

WILSON - Direct

1    will at that time?

2       A    Yes, sir.

3       Q    Did you know at that time that you were a

4    suspect in this robbery?

5       A    Yes, sir.

6       Q    At that time, did you tell him the truth?

7       A    No, sir.

8       Q    What did you tell him?

9       A    I don't recall.

10      Q    But you know you didn't tell him the truth?

11      A    No, sir.

12      Q    Why didn't you tell him the truth at that

13    time?

14      A    Because I was scared.

15      Q    Scared of what?

16      A    Because I never been in trouble like this

17    before.

18      Q    How old are you?

19      A    Eighteen years old.

20      Q    After that interview, do you remember

21    speaking again to Detective Hudson on or about

22    February 21st, the date of your preliminary hearing,

23    along with your attorney Mr. Chasanov present?

WILSON - Direct

1     A     Yes, sir.

2     Q     Did you talk about this incident with

3     Detective Hudson and your attorney?

4     A     Yes, sir.

5     Q     Did you speak to them at that time of your

6     own free will?

7     A     Yes, sir.

8     Q     Did you tell the truth then?

9     A     Yes, sir.

10    Q     Did you admit your involvement in this

11    robbery then?

12    A     Yes, sir.

13          MR. ADKINS:  I have no further questions.

14          Thank you.

15          MR. BRADY:  May we approach, Your Honor?

16          (Whereupon, counsel approached the bench and

17    the following proceedings were had:)

18          THE COURT:  3507.

19          MR. ADKINS:  Possibly.  I think just to give

20    the jury the complete picture it's about a ten-minute

21    tape where he denies he is involved in the robbery

22    but admits he is riding around with Jarid Cubbage and

23    Daron Lewis, and I think in the interest of

WILSON - Direct

1    completeness I probably should play it for the jury.

2           THE COURT:  All right.

3           MR. BRADY:  I agree.  My only problem is

4    this:  The last two questions were about a non-taped

5    interview that Detective Hudson made with the

6    witness.

7           THE COURT:  You mean at the preliminary

8    hearing?

9           MR. BRADY:  After preliminary hearing.

10          THE COURT:  So are you going to elicit that

11   testimony?

12          MR. BRADY:  There are no notes available

13   because Detective Hudson can't find the notes.

14          MR. ADKINS:  Well, he is not sure there ever

15   were any, but he certainly can't find any.  It was

16   not taped.

17          MR. BRADY:  It was not taped.

18          MR. ADKINS:  It was Mr. Chasanov and

19   Detective Hudson sitting down with him at preliminary

20   hearings.  I don't intend to call -- well, I don't

21   intend to -- really, I guess, the only thing I would

22   ask maybe if I put Detective Hudson on the stand to

23   play the tape of the February 10th interview is, "Did

CHRISTINE L. QUINN
OFFICIAL COURT REPORTER

A -34

WILSON - Direct

1   you talk with him on February 21st with his attorney

2   present?  Did he admit his involvement?"

3        THE COURT:  I guess you would have to say

4   what did he say because it's the words of the

5   evidence.

6        MR. BRADY:  Right, and I guess my problem is

7   that I don't have any notes, and I don't know if

8   there were notes and they were lost, or there were

9   never any notes made, and so although it appears to

10  be proper for 3507, I didn't object when he asked

11  him, "Did he admit his involvement", because I am not

12  trying to defend against this witness' involvement.

13  My concern is that any testimony regarding the

14  involvement of my client because I have no way to

15  examine because of either the non-taking of notes,

16  the non-taping of the interview, or the possible loss

17  of the notes.

18       THE COURT:  I am just going back on what he

19  said here at the end and the way the question seemed

20  to have been phrased in the end.  The answer he

21  admitted his involvement.  It was his only.  I

22  suppose if you limit it to that, that doesn't raise

23  any problem.  Can you limit it to that?

IN THE SUPERIOR COURT OF THE STATE OF DELAWARE
IN AND FOR SUSSEX COUNTY

| | | |
|---|---|---|
| STATE OF DELAWARE | ) | |
| | ) | |
| v. | ) | I.D. No. 0202007080 |
| | ) | |
| JARID L. CUBBAGE | ) | |

| | | |
|---|---|---|
| STATE OF DELAWARE | ) | |
| | ) SS | |
| COUNTY OF SUSSEX | ) | |

### AFFIDAVIT OF JOHN F. BRADY

**NOW COMES** John F. Brady, and responds as follows to the Motion filed by Mr. Cubbage as follows:

**ONE**
**Ground I-** Against Mr. Adkins.

Denied--Mr. Adkins in the discovery response gave the defense a copy of the police report that indicated Mr. Wilson gave a non-taped statement at the courthouse to Det. Hudson with Mr. Chasanov present. I talked to Mr. Chasanov prior to the trial, and he confirmed the statement. Det. Hudson could not locate his notes, and I questioned him about that.

**TWO**
**Ground II-** Against the Court.
The court made a ruling adverse to Mr. Cubbage over my objection.

**THREE**
**Ground III-** Against Mr. Adkins.

A-2b-a

2004 SEP 16 PM 4: 20

The state, over defense objection, requested the introduction of the doo-rags and gloves plus pictures of them. I vigorously cross-examined each witness about those objects to point out the inconsistencies.

## FOUR
**Ground IV-** Against Mr. Adkins.

I conducted a cross-examination of Det. Hudson that I reviewed with Mr. Cubbage prior to and during questioning.

## FIVE
**Ground V-** Against Mr. Adkins.

The Court ruled that Mr. Adkins could question Mr. Cubbage about not giving an alibi at the time of the interview over my objections.

## SIX
**Ground VI-** Denied--Against me.

Mr. Adkins in the discovery response gave the defense a copy of the police report that indicated Mr. Wilson gave a non-taped statement at the courthouse to Det. Hudson with Mr. Chasanov present. I talked to Mr. Chasanov prior to the trial, and he confirmed the statement. Det. Hudson could not locate his notes, and I questioned him about that.

## SEVEN
**Ground VII-** Denied.

I did review the discovery and the record with Mr. Cubbage of Mr. Wilson. Further, the specific crime is not admissible because Mr. Wilson admitted he pled guilty to a felony and was serving a sentence. Your honor instructed the jury that Mr. Wilson and Mr. Lewes had pled guilty and had been convicted of two felonies – see attached.

## EIGHT
**Ground VIII-** Denied.

I did cross-examine Det. Hudson with his prior testimony in the preliminary hearing. I argued the lack of evidence in a Motion for Judgment of Acquittal and my closing.

## NINE
**Ground IX-** Denied.

Mr. Adkins had no notes to produce because Det. Hudson had no notes. I verified the statement with Mr. Chasanov. In the appeal I raised the 2 biggest issues and did state in argument #2 – see page 13 of brief attached the lack of the notes as to the sufficiency of the evidence.

A-26-b

I picked up this case when Mr. Barnett left the contract.  I worked very hard on the case, reviewed the evidence and presented a vigorous defense at trial.

I was not ineffective.  I did not vindicate Mr. Cubbage, but it was not because of a lack of effort or preperation, but in my opinion bad facts.

John F. Brady

**SWORN TO** and **SUBSCRIBED** on 16th day of September 2004.

**NOTARY PUBLIC**

LAURA ADKINS
MY COMMISSION
EXPIRES
FEBRUARY 2, 2008
NOTARY PUBLIC
STATE OF DELAWARE

A - 26 - C

HUDSON - Direct

1   suppression because it would have violated the

2   standard procedures in court to file a suppression

3   motion.

4           MR. ADKINS:  Do you want me to explain

5   this?  I provided automatic discovery in this case

6   to Mr. Barnett.  On that discovery, which I -- in

7   substance, what I said -- I can get it verbatim.  I

8   said, I've got these tapes.  You can make copies of

9   them, you can listen to them, you can send us blank

10  tapes and I will provide you with the tapes

11  themselves.

12          I did not receive any response from Mr.

13  Barnett.  I did not receive any response at all

14  with regard to listening to the tapes or being

15  given copies of the tapes by either counsel.  Last

16  week, out of the abundance of caution, I sent a

17  cover letter with this saying, despite the fact

18  that you all have made no attempts to come listen

19  to the tape, I have blank tapes and I'm using my

20  own blanks.  Here's copies of every tape in the

21  case.

22          THE COURT:  I am certain that you have

23  fulfilled every requirement and have gone beyond

D-112

1    fact that there is testimony that he is in the trunk

2    there at the Salvation Army taking stuff out of the

3    trunk and that things that were used in this were put

4    in the trunk; despite the fact that he is also in the

5    trunk at Joselle's; and despite the fact that he has

6    this vehicle through all this time, they do the search

7    and they still find things related to this robbery.

8            William Wilson took that stand -- I mean, who

9    should know better what they were wearing than the

10   person who wore it -- and he identified that red and

11   white doo-rag as the one he was wearing; that he put

12   over his face.  He even puts it on for you in front of

13   the jury.  And that was found in the car.  You recall

14   the testimony firsthand.  My recollection right now is

15   that it was in the trunk.  If it was somewhere else in

16   the car, you are the ones who determine where it was

17   found.  But in the trunk of the gold Camry.

18           You might say, "Well, how about Michael

19   Johnson?  He couldn't identify the red and white

20   doo-rag."  That is where it goes to back to when you

21   have witnesses testifying, it goes to their

22   perceptions.

23           How could Michael Johnson's perceptions be

EILEEN G. KIMMEL
OFFICIAL COURT REPORTER

A-28

D-113

1  affected?  Well, it is eight months later.  At the

2  time, what could be affecting his perceptions of color,

3  of things, of exactly who was wearing what?  It is

4  nighttime.  It is dark.  It is not every day that you

5  walk out the back door of your place of work and find a

6  gun pointed at the head of your co-worker and another

7  person with a bat who tells you you better move on and

8  get in the dumpster.  That's an upsetting event.  That

9  is a traumatic event.  He said he was shook up.

10          But the person who wore that knows what they

11  wore.  It is pointed out to you, and then it is

12  connected to that man because he says they are his

13  doo-rags.  They were found in his trunk, and that was

14  what was worn by William Wilson.

15          In addition, to corroborate Michael Johnson,

16  where it says on the tape that the third party had

17  gloves.  They were black gloves.  They confiscated

18  gloves also, so you have evidence of a pair of black

19  gloves and you have the one black glove.  Maybe any

20  effort to get rid of everything wasn't completely

21  successful in a junky trunk, in a junky car, and the

22  black gloves and the doo-rags still remain.

23          There is a black bandana, too, or doo-rag,

B-6

LEWIS - Direct

| 1 | Q | And do you remember what kind of car he had? |
| 2 | A | Camry. |
| 3 | Q | Camry? |
| 4 | A | (Witness nodding head in the affirmative.) |
| 5 | Q | Could you tell us where you went? |
| 6 | A | To pick Billy up, William Wilson. |
| 7 | Q | Where did you go to pick him up? |
| 8 | A | Church, some church in Millsboro. |
| 9 | Q | And were you able to pick him up that first |
| 10 | | time? |
| 11 | A | No. |
| 12 | Q | Why not? |
| 13 | A | Because his aunt said church wasn't over |
| 14 | | yet. |
| 15 | Q | So where was William, Bill Wilson -- |
| 16 | A | Church. |
| 17 | Q | -- when you went to pick him up? |
| 18 | A | At church. |
| 19 | Q | Then can you recall where you went? |
| 20 | A | McDonald's, get something to eat. |
| 21 | Q | After that, do you know where you went? |
| 22 | A | Went back to get -- pick Wilson up. |
| 23 | Q | And where did you pick him up? |

CHRISTINE L. QUINN
OFFICIAL COURT REPORTER

LEWIS - Direct

1     A     At the church.

2     Q     What happened after that?

3     A     We went back to McDonald's.

4     Q     Then what happened?

5     A     Then we was -- we left McDonald's went to

6     Dollar General.

7     Q     Why did you go to Dollar General?

8     A     Because Cubbage had a plan to rob Burger

9     King.

10     Q     When was that discussed?  When did you talk

11     about that?  Did you talk about that prior to going

12     to Dollar General?

13     A     When we was in the car going toward Dollar

14     General.

15     Q     Who was in the car when that was discussed,

16     the plan to rob Burger King?

17     A     Me, Wilson, and Cubbage.

18     Q     Who started the discussion about robbing

19     Burger King?

20     A     Cubbage.

21     Q     I'm going to show you something.  I'm going

22     to show you what's been marked as State's Exhibit B

23     for identification.  Do you see this?

B-61

WILSON - Direct

1    employed with them at that time?

2        A    No, sir.

3        Q    When you were working with Burger King, was

4    Daron Lewis working there?

5        A    Yes, sir.

6        Q    And was Jarid Cubbage working there?

7        A    Yes, sir.

8        Q    I want to skip ahead to Friday night,

9    February 8th, 2002, late that night, and into the

10   early morning hours of Saturday, February 9th, 2002.

11   Did you come into contact with either Daron Lewis or

12   Jarid Cubbage that Friday night, February 8th?

13       A    Yes, I did.

14       Q    What were you doing that Friday night?

15   Where were you?

16       A    I was at church.

17       Q    What church?

18       A    Saint John Second Baptist in Millsboro,

19   Delaware.

20       Q    And what happened after church?

21       A    Went down to Rehoboth Beach down to the

22   McDonald's.

23       Q    Let's back up because I want you to take

B-62

WILSON - Direct

1    this step-by-step.  When did you first see either

2    Daron Lewis or Jarid Cubbage that night?

3        A    When they came pick me up from church.

4        Q    Did they both come pick you up?

5        A    Yes, sir.

6        Q    Do you know whose car was used?

7        A    Jarid Cubbage.

8        Q    Do you remember anything about what kind of

9    car that was?

10       A    I know it was a Camry.  I know Toyota Camry.

11   I don't know what kind of year.

12       Q    So when you got in with them after church,

13   where did you go?

14       A    Down to Rehoboth Beach to McDonald's.

15       Q    And what did you do there?

16       A    Just talked to a couple of friends.

17       Q    All right.  Then what did you do after that?

18       A    Went -- can you repeat the question one time

19   for me.

20       Q    After you were at McDonald's --

21       A    Okay.

22       Q    -- did you go anywhere after McDonald's that

23   night?

JOHNSON - CROSS

1                    CROSS-EXAMINATION

2    BY MR. BRADY:

3        Q.    Good afternoon, Mr. Johnson.  How are you

4    doing?  I take you back to February 8th.  What time

5    did you come into work that day?

6        A.    4:00 o'clock.

7        Q.    Who was the assistant manager on duty when

8    you came?

9        A.    Jarid.

10       Q.    What time did Jarid leave that night?

11       A.    About 9:00 o'clock.

12       Q.    And at that time isn't there a cash drop in

13   the middle of that mid-shift?

14       A.    No.

15       Q.    There is no cash drop from Mr. Cubbage before

16   Mr. Cubbage leaves?

17       A.    No, there isn't.

18       Q.    So what times of day are there cash drops?

19       A.    Only two times we drop cash.  That would be

20   the morning shift, about 3:30, then when I leave after

21   work.

22       Q.    What is your normal work schedule or what was

23   your normal work schedule in February of 2002?

B-5

LEWIS - Direct

1    A    Yeah.

2    Q    And do you call him William or what does he

3    go by?

4    A    Bill.

5    Q    Bill.  And do you also know a person by the

6    name of Jarid Cubbage?

7    A    Yeah.

8    Q    Back on say February 8th and February 9th,

9    Friday night, February 8th, and the early morning

10   hours of February 9th, were you with William Wilson

11   and Jarid Cubbage?

12   A    Yeah.

13   Q    On Friday night, February the 8th, when did

14   you first come in contact with either one of them?

15   A    Like six, five or six.

16   Q    I have trouble hearing you.

17   A    Like five or six.

18   Q    Who did you come in contact with at five or

19   six?

20   A    Cubbage.

21   Q    And where were you, and how did you come in

22   contact with him?

23   A    I was home.  He came picked me up.

B-38

LEWIS - Cross

1    construction site.

2         Q    Standing in the construction site.  Okay.

3    And who approached Jason when Jason came out with the

4    trash?

5         A    First I approached, and then Wilson was

6    like -- we both like left at the same time, but Jason

7    saw me first then he saw Wilson.

8         Q    And you had the gun at that point?

9         A    Yeah.

10        Q    What did you do to Jason?

11        A    I just told him to call the manager.  He

12   stopped, and he just -- he said, "What is going on?"

13   I said, "Call the manager out", and that's what he

14   did.

15        Q    Now at that point when you told him to call

16   the manager out --

17        A    Yeah.

18        Q    -- how close was Jason to the back of the

19   building?

20        A    He was like behind the building.  He was

21   like right there.  He was like behind the building.

22             MR. BRADY:  Your Honor, yesterday we had a

23   drawing made.  May the witness refer to the drawing

CHRISTINE L. QUINN
OFFICIAL COURT REPORTER

B-68

WILSON - Direct

1     Q    All right.  So what did you do next after
2     you stopped and talked about it a little more?  What
3     happened next?
4     A    We waited for the lights to go out at Burger
5     King on all sides, the south and north side, then we
6     got our weapons.
7     Q    What do you mean "you got your weapons"?
8     A    Daron Lewis had the gun, and I had the bat.
9     Q    Do you recall whether Daron Lewis had
10    anything partially covering his face?
11    A    He might have had like a hoodie or a mask.
12    I don't recall.
13    Q    How about Jarid Cubbage; do you recall?
14    A    No, sir.
15    Q    All right.  Once you had the bat and Daron
16    Lewis had the gun, what happened next?
17    A    We wait for the lights to go out.  And then
18    we walked over to the Burger King on the north side.
19    Q    Where did you walk?  Where did you walk to
20    around the Burger King?
21    A    Right around from Cafe Italiano right around
22    to the drive-thru of Burger King.
23    Q    What did you do next?

CHRISTINE L. QUINN
OFFICIAL COURT REPORTER