B-69

WILSON - Direct

1    A    We wait for Jason to come bring the trash

2    out.

3    Q    Did you see Jason bring the trash out?

4    A    Yes, sir.

5    Q    What did you see Jason do?

6    A    I seen him when he came around with the

7    trash.  He was jogging, and he put the trash in the

8    trash can, then he came back.

9    Q    What happened when he came back?

10    A    Excuse me.  Repeat that.

11    Q    What happened when Jason came back after

12    putting the trash in the Dumpster?

13    A    Me and Daron went around the corner and told

14    him to get the manager and told him to come outside.

15    Q    Do you recall where Jarid Cubbage was at

16    that time?

17    A    No, sir.

18    Q    What happened next?

19    A    Then he called the manager out, and we took

20    both of them to the Dumpster.

21    Q    What did you do over at the Dumpster?

22    A    Just put them in the Dumpster and closed it.

23    Q    How did you "put them in the Dumpster"?

CHRISTINE L. QUINN
OFFICIAL COURT REPORTER

A-21

JOHNSON - DIRECT

1      Q.    Yourself, Pamela -- do you know her last

2    name?

3      A.    Bland.

4      Q.    And who else?

5      A.    Jarid Cubbage.

6      Q.    Was Pamela working at all that night?

7      A.    No, she was off for the day.

8      Q.    Was Jarid Cubbage working that night?

9      A.    He had worked a split.

10     Q.    What does that mean?

11     A.    He works a midday.  He works in the middle of

12   two shifts.

13     Q.    What shift was that?

14     A.    That would be the mid-shift.  Anywhere from

15   10 to 7 -- 10 to 7 or 12 to 9.

16     Q.    During the time just a few hours before

17   closing was Jarid Cubbage working at the store at that

18   time?

19     A.    I believe he got off at 9:00 o'clock.

20     Q.    Between that time and like 1:00 a.m. the next

21   morning, did you receive any call from Jarid Cubbage?

22     A.    Jarid had called to see if an employee was

23   there.

A-22

JOHNSON - DIRECT

1    Q.   Did you speak to him?

2    A.   Yes, I did.

3    Q.   Did you know it was Jarid Cubbage who was

4    making that call?

5    A.   Yes.

6    Q.   And asking who was there?

7    A.   Yes.

8    Q.   And did he identify himself as Jarid Cubbage?

9    A.   Yes, he did.

10        MR. BRADY:  Your Honor, may we approach the

11   sidebar?

12        THE COURT:  Yes.

13        (Whereupon, counsel approached the bench and

14      the following proceedings were had:)

15        MR. BRADY:  He is now awake, Alternate No. 4,

16   who fell asleep a few minutes ago.

17        THE COURT:  Okay, thank you.

18        MR. BRADY:  That is the second time.  It

19   happened -- he woke up on his own right at the end of

20   the opening.  And if he feels he can't proceed, then

21   you may wish to excuse him now.  I did try to relay to

22   get Terry's attention since I couldn't get Ed's

23   attention, I got Detective Hudson's attention.  I

DAVID WASHINGTON
Official Court Reporter

A-40

Cubbage – Direct                    D-9

1      Q      And what did you do next?

2      A      I bought some alcohol.  And then I was on my

3   way to Milford and Dover.  I was going to Milford

4   because of the club called Park Place that I had been

5   hearing about.  After I went there, I was going to go

6   to my grandma's house to visit, and then change for the

7   club, because I didn't know where the Park Place was.

8   On my way to Dover, I had a call from Trineina asking

9   me to come visit her.

10     Q      Did you visit her that night?

11     A      Yes.

12     Q      What time did you get there?

13     A      It was after 11:00, because I had made two

14  stops.  Stopped at Wendy's in Milford to get something

15  to eat because I didn't eat all day.  I don't eat

16  Burger King food.  So in between Milford and Seaford, I

17  got hungry again, so I went to McDonald's in Seaford.

18  And while I was in the drive-thru window, I called Mike

19  to tell him if my wife called, to tell her I went to

20  Dover.  But when he answered the phone, he told me to

21  hold on, and wherever he sat the phone down by a

22  register, I could hear him talking to customers.  So I

23  just, like, hung the phone up.

B-45

LEWIS - Cross

```
 1      Q    Did you see him go into that door from your
 2   location at the Dumpster?
 3      A    I didn't see him go in there myself but.
 4      Q    At any time, did anyone go near the
 5   drive-thru window?
 6      A    No.  Near the drive-thru window?
 7      Q    At any time, did you see Jarid, as you say
 8   he was there, go near the drive-thru window?
 9      A    No.
10           MR. BRADY:  Your Honor, may I have a moment,
11   please.
12           I'm done with the pointer for the moment,
13   Mr. Joyner.  Thank you.
14           THE BAILIFF:  You're welcome, sir.
15           MR. BRADY:  I may have a couple more
16   questions.
17           (Whereupon, there was a pause in the
18        proceedings.)
19           MR. BRADY:  Thank you, Your Honor.  Sorry
20   for the momentary pause.
21   BY MR. BRADY:
22      Q    What did you do on Saturday after this event
23   took place?
```

CHRISTINE L. QUINN
OFFICIAL COURT REPORTER

WILSON - Direct

1    Q    What happened after you picked Jarid back

2    up?

3    A    We went to -- we went riding because we was

4    going to go to Salisbury that night.

5    Q    At that point, is there any discussion about

6    what happened at Burger King or the money?

7    A    Yes.

8    Q    And what was it?

9    A    That we was just going to hold it until

10   discussion went by, until everything blew by.

11   Q    Until everything what?

12   A    Blew by, went by.

13   Q    Well, did Jarid say he got money?

14   A    No.  No, sir.

15   Q    Well, what are you doing?  You are going to

16   hold money "until everything blew by"?

17   A    Well, they was just talking about it.

18   Q    How were you talking about it, Mr. Wilson,

19   that's what I'm asking?

20   A    When he got back in the car, we just started

21   talking we going to hold the money.  Jarid, Daron

22   said, was going to hold the money.  Nobody said who

23   had it but hold the money until everything cooled

B-119

BLAND - Direct

1    Q    How about Jarid Cubbage?  Do you know Jarid

2    Cubbage?

3    A    Yes.

4    Q    Do you know about when he worked there?

5    A    May of 2000 until February of 2002.

6    Q    In February of 2002, other than yourself,

7    were there any assistant managers at that location?

8    A    Yes.

9    Q    Who were they?

10   A    Jarid Cubbage and Michael Johnson.

11   Q    Other than the owners of that Burger King

12   restaurant, in early February of 2002, who would have

13   keys to the safe in the restaurant?

14   A    Me and -- myself, Michael and Jarid.

15   Q    Nobody else?

16   A    No.  And the owners, yes.

17   Q    Yes, the owners?

18   A    Yes, okay.

19   Q    And where is the safe located in the Burger

20   King?

21   A    Right on my front line.

22   Q    All right.  Can you give anymore description

23   about what is around it or whatever?

A-39

JOHNSON - DIRECT

1    mechanism, a small motor.

2        Q.    How far would you say that that sliding

3    drive-thru window is from the safe?

4        A.    Three feet.

5        Q.    Did you do anything with respect to that open

6    drive-thru window?

7        A.    I closed it.

8        Q.    Did you lock it again?

9        A.    Yes, I did lock it.

10       Q.    Did you look around the whole inside?

11       A.    Yes, I did.

12       Q.    Did you notice anything missing?

13       A.    The only thing I noticed missing was my

14   deposit bag at the time.

15       Q.    It was no longer on the silver table in the

16   back?

17       A.    No, it wasn't.

18       Q.    Was did the safe -- what was the condition of

19   it, was it open, was it closed, locked, what was it?

20       A.    It was still locked.

21       Q.    This gun that you saw, you say, in Daron

22   Lewis's hand --

23       A.    Yes.

BLAND - Direct                      B-123

1      A      Yeah.

2      Q      Did there come a time when you checked that

3   safe?

4      A      Saturday morning.

5      Q      What was your schedule Saturday morning the

6   ninth?

7      A      6:00 a.m.

8      Q      What time did you leave the store in the

9   early morning hours Saturday after being called in

10  for this?

11     A      I stayed about approximately two and a half

12  hours.

13     Q      What time do you think you left?

14     A      Like 3:30.

15     Q      And you were back at 6:00 a.m.?

16     A      Yes.

17     Q      You were opening?

18     A      Yes.

19     Q      Did you check the safe?

20     A      Yes.

21     Q      How did you open the safe?

22     A      I put my key in and opened it.

23     Q      Well, how about the combination?

B-16

LEWIS - Direct

1    BY MR. ADKINS:

2        Q    Did, either you or Bill Wilson go inside the

3    Burger King that night?

4        A    No.

5        Q    All right.  After you went to West Rehoboth,

6    where did you and Bill Wilson go next?

7        A    We went to pick Wilson up.  I mean Cubbage

8    up near Funland by Jungle Jim.

9        Q    Which Funland are you talking about?

10       A    Rehoboth.

11       Q    Rehoboth.  Are you talking about in the city

12   or out on the main highway, Route 1?

13       A    On the main highway.

14       Q    Route 1?

15       A    (Witness nodding head in the affirmative.)

16       Q    Then where did you go?  What happened?

17       A    We went to Ocean City to get to Salisbury,

18   and from there, we went to his -- we went to a girl

19   name, Joselle, house where Cubbage went in the house

20   for like twenty, twenty-five minutes and then.

21       Q    Before he went in that house, did he do

22   anything else?  Do you know if he got anything out of

23   the car?

CHRISTINE L. QUINN
OFFICIAL COURT REPORTER
A-47

B-11

LEWIS - Direct

1       Q      Then what happened when he came back?

2       A      We went up there, told him to call the

3    manager out.

4       Q      You did?

5       A      Me and Wilson.

6       Q      And you had the gun at that point?

7       A      Yeah.

8       Q      And Wilson had the bat?

9       A      Yep.

10      Q      What happened next?

11      A      Then he called the manager out.  We walked

12   him toward the back of the Burger King, and Cubbage

13   ran in there and got the money and ran out, and we

14   left, and we left.

15      Q      Did Cubbage have gloves on?

16      A      Yeah.

17      Q      Do you remember what color they were?

18      A      White.  They were like white gloves.

19      Q      All right.  And what, if anything, did you

20   do with Jason and the other guy that came out of the

21   restaurant?

22      A      We just walked them toward the Dumpster, and

23   there was an area, told them to get in the area, and

SWAIN - Cross

1    store before the police got there?

2         A    There was some employees there in front of

3    the dining area, if I remember correctly.

4         Q    Now, you took some photographs also, did

5    you not?

6         A    Yes, I did.

7         Q    And did you find any footprints on the

8    scene?

9         A    Yes, I did.

10        Q    And how many footprints did you find?

11        A    There was basically a bunch of partial

12   footprints inside.

13        Q    How many different types of footwear of

14   the partial footprints did you find?

15        A    It was really hard to tell since they were

16   partial.  Because you could, you know, have part of

17   a footprint here that didn't match up.  In my

18   estimate, there is at least two different types, if

19   not three.

20        Q    And, in fact, you took photographs of

21   those two or three different types of footprints,

22   did you not?

23        A    Yes, I did.

| Page 1 | Report Date 03/08/2002 | Troop 4 State Police | | 07-07-004670 |
|---|---|---|---|---|

## Supplemental Report - #4

| Original Occurrence Dates and Times: SAT 02/09/2002 0100 thru SAT 02/09/2002 0115 | Grid 204-114 | Sector 73 |
|---|---|---|

Original Location:
**4545  HIGHWAY ONE  BURGER KING RESTAURANT     Rehoboth Beach, DE 19971**
**STATE ROUTE 1  2 MILES NORTH OF REHOBOTH**

### Investigative Narrative

CU-4 Criminalistics Service Report #02-47

Robbery Scene Report

Notified by:  Sgt. Meyers, Troop 7

Date & time:  02/09/02  0245

Arrived:    02/09/02  0325

Departed:   02/09/02  0719

Officers Present:  Det Doug Hudson, Troop 4    Major      Crimes Squad

Investigating Officer: Det Doug Hudson, Troop 4    Major Crimes Squad

Location:  Burger King, 4545 Highway One  Rehoboth, Beach 19971

Services Provided:  At the request of Sgt Meyers, writer responded to the Midway Burger King to      process the scene of a robbery.  Upon arrival, I contacted Det Doug Hudson reference the known facts of the case (see his report for details).

I began processing the scene by taking a video of same.  In addition, photos were taken  of suspect    footprints, which were left by mud on the floor from the north side rear door, through the kitchen, and behind the front counter.

However, these footprints were only partial footprints.  Most appear to have been made by one type of sneaker, but     there is evidence of a second type (and possibly a third) as well.

On the outside, in a construction area next to and north of the Burger King business, three types of possible suspect footprints were located by writer.

These footprints were     alsovideotaped and photographed.  The exterior footprint, which is labeled as footprint #5, #6, and #7 has similar characteristics as the partial footprint that was located the most inside of the business.  In addition, one sneaker, which is #04-2797,   was collected by Det Doug Hudson during his search of defendant Cubbage's Toyota Camry.

However, the design on this sneaker does not appear to match any writer photographed at the scene.  Also, in this construction area, writer also     photographed a  track which appears to be from a bicycle tire.  However, writer does not know if a bicycle was involved in the incident or not.  For more details of the footprints, see the photographs, which are attached

| Reporting Officer SGT SWAIN  - 2079 | Supervisor Approval STEVE SWAIN PSPT079 Date 03/08/2002 2143 |
|---|---|

54

HUDSON - Direct

1    Q    Detective Hudson, I'm going to put into

2    this machine State's Exhibit 14.  Did you take that

3    photograph?

4    A    Yes, sir, I did.  That's in the parking

5    lot at Troop 4.

6    Q    Can you tell us what that is?

7    A    That is Jarid Cubbage's 1998 gold Toyota

8    Camry.

9    Q    Is that the vehicle you searched?

10    A    Yes, sir, it is.

11    Q    State's Exhibit 15.  Did you take that

12    photograph?

13    A    Yes, sir, I did.

14    Q    What's that?

15    A    On the defendant is the red and white

16    bandana, and on the right there is a black bandana

17    or doo-rag that I found in the trunk of the

18    vehicle.

19    Q    State's Exhibit 16.  Did you take that?

20    A    Yes, sir, I took that photograph.

21    Q    What is that?

22    A    That is a black leather glove or

23    leather-type material.

HUDSON - Direct

1    Q    Where did you find that?

2    A    That was in the rear seat of the vehicle

3  of that 1998 Toyota Camry.

4    Q    State's Exhibit 16.  Did you take that

5  photo?

6    A    Yes, sir, I did.

7    Q    What is that?

8    A    This is a pair of gloves and a white

9  bandana.

10   Q    All right.  Where did you locate those?

11   A    The pair of gloves came from the right --

12  sorry -- from the front passenger seat of the

13  vehicle.

14        THE COURT:  That last photo was No. 17, I

15  guess.

16        MR. ADKINS:  Yes, Your Honor.

17  BY MR. ADKINS:

18   Q    Detective Hudson, I'd like to hand you

19  this bag.

20   A    Yes, sir.

21   Q    Have you ever seen that bag before?

22   A    Yes, sir.  It's the evidence -- it's my

23  writing on the front of the bag.  It contains --

HUDSON - Direct

1    I'm sorry, I misstated that.  It was a light blue

2    bandana, not white.  Dark blue bandana and two

3    black gloves.  This is my writing.  I placed these

4    items in the evidence bag.

5        Q    Could you retrieve the two black gloves?

6        A    (Witness complied.)

7        Q    Are those the gloves that you retrieved

8    from the gold Camry?

9        A    Yes, sir.

10       Q    If I could have those, please.

11            MR. ADKINS:  Your Honor, I offer this pair

12   of gloves as the next State's numbered exhibit.

13            THE CLERK:  Admitted as State's Exhibit

14   No. 18.

15   BY MR. ADKINS:

16       Q    May I have that bag, please?  I hand you

17   another bag, Detective Hudson, and ask you if

18   you've seen that bag before.

19       A    Yes, sir.  It's an evidence bag with my

20   handwriting on it.  It contains a black T-shirt.

21       Q    Well, what I'm really interested in is, is

22   there a glove you collected in that bag?

23       A    Yes, sir, it's the one separate single

HUDSON - Direct

1    glove.

2        Q    Would you retrieve that?

3        A    Yes, sir.

4        Q    All right.  Where did you retrieve that

5    glove from?

6        A    The one single glove came from the rear

7    seat of the vehicle.

8        Q    Can I have that?

9            MR. ADKINS:  Your Honor, I offer this

10   glove as the next State's numbered exhibit.

11           THE COURT:  Very well.  It is admitted

12   then.

13           THE CLERK:  Admitted as State's Exhibit

14   No. 19.

15   BY MR. ADKINS:

16       Q    With regard to the bat and gun, did you

17   locate those items in your investigation?

18       A    Yes, sir, I did.

19       Q    How did you do that?

20       A    On the 12th of February 2002 at 12:45, I

21   picked up Daron Lewis at SCI and he took me to, I

22   believe it was Hebron Road -- I'm sorry.  No.  It

23   was 114 Duffy Street, and directed me to an

| 02/20/2002 | Troop 4 State Police | 07-02-004070 |

Investigative Narrative - Continued

ue. Defendant Wilson made no statements.

1002 at 1500 hrs. I responded to the Burger King Restaurant and took Defendant Jarid
e into custody without incident. He  was an assistant manager there, and had just began
rk shift at 1500 hrs. Upon contacting Defendant Cubbage, he was behind the counter near
 the cash registers.

s dressed in a Burger King uniform, and he had a large set of keys in his pants pocket.  I
removed the keys and took possession of them.

dant Cubbage was   then taken to DSP 4 by Tfc. Windish of DSP 7.

dant's vehicle (a  1998 Toyota Camry DE. Reg 194705, gold in color) was parked on the
side of the Burger King.  It was subsequently towed to DSP 4 as evidence.

e I was conducting thisportion of the investigation, Det. Bethard of DSP 4 processed
dant Daron Lewis and Defendant William Wilson.  They were committed to SCI in default of
  Refer to Det. Bethard's supplement for details.

21002 at 1515 hrs. I contacted  Ms. Pamela Bland at the Burger King.  She was called in
Defendant being arrested.  She confirmed that keys to the Burger King resturant, the Burger
safe and the Burger King bank deposit box were on the key ring.  Ms. Bland also confirmed
Jarid knew the combination to the safe.

21002 at approximately 1530 hrs. I responded to Norwood Street in West Rehoboth and
pted to locate the B.B. gun, which Defendant Daron Lewis told me about.  I could not locate
un.

   021002 at 1550 hrs. I contacted Victim Michael Johnson at the Burger King.

alked about a threatening phone call he received from Defendant Cubbage.

r to Victim Michael Johnson's attached statement.

21002 at 1700 hrs. I interviewed   Defendant Jarid Cubbage at DSP 4.  Refer to his attached
ment, as well as the audio tape of the interview for the exact dialogue.  He made no
sions.

21102 I obtained a search warrant for Defendant Cubbage's vehicle. A 1998 Toyota    Camry
in color, DE Reg. 194705.

21102 at 1500 hrs. I executed the search warrant on Defendant Cubbage's vehicle.  The
wing items were seized:

ted in trunk--1 red/white bandana, 1 black bandana, 1 pair of white Rebok sneakers.

ed in rear seat--1 black t-shirt, 1 black golf type shirt, 1 black glove.

| Officer<br>HUDSON   -4716 | Supervisor Approval<br>CHARLES C BROWN  PSPT560  Date 02/27/2002 1239 | A - C C |

## Investigative Narrative - Continued

Located in front passenger seat--1 light blue bandana, 1 dark blue bandana, 1 pair of black loves.


On 021202 at 1220 hrs. I contacted Ms. Ruth Smythe of the Public Defenders Office and requested o take Defendant Daron Lewis to West Rehoboth to show me where he stored the hangun (B.B. gun) hat was used in the Robbery of the Burger King. She gave her permission to do so.


On 021202 at 1245 hrs. I met Defendant Daron Lewis at SCI. He agreed to take me to West ehoboth and show me where he placed the B.B. gun. At 1315 hrs.

we arrived in West   Rehoboth and      Defendant Daron Lewis directed me to to 114 Duffy treet. He then pointed to a disabled Cadillac Cimeron bearing DE Reg.

368046 and stated that the B.B. gun and bat were under the car, near the left rear wheel. I hen looked under the vehicle and observed a handgun and an aluminum baseball bat. I then hotographed the items before removing them from under the vehicle. Refer to the photographs. then removed the bat and handgun and placed them in the trunk of my vehicle. The bat is a ortTeeball bat. The handgun is a Marksman B.B. gun. Serial #98062864. I then transported efendant back to SCI, and I transported the bat and B.B. gun back to DSP 4. The items were iven to Sgt. Swain at 1430 hrs. for processing.


On 021202 Ms.    Stacy Cubbage, who is Defendant Jarid Cubbage's wife retrieved the 1998 Toyota amry from DSP 4.


On 021802 at 0831 hrs. I responded to JP 3 and met with Judge Hagan and conducted the search arrant return. At that time he reviewed the items thatwere seized during the execution of the earch warrant.


### Statement of Victim 001 - JASON BAULL

On 020902 at 0240 hrs. I interviewed Victim Jason Lee Baull. Mr. Baull stated that he was orking the night shift with Victim Michael Johnson at the Burger King, and that Mr. Johnson was he night manager. Mr. Baull added that they closed the     restaurant at midnight and he and r. Johnson were cleaning up from the night's business. Mr. Baull then stated that at around 100 hrs. he exited the rear door of the restaurant and took some trash out to the dumpster, and pon his return to the   rear door, he was accosted by two males wearing all dark or black lothing. He then stated that a third male was leaning against the restaurant near the rear oor. Mr. Baull described the male leaning against the building as approximately 6' 1'   with muscular build, all dark or black clothing, a fleece type top with the hood pulled up.

He also had a ski mask (possibly neoprene) over his face. Mr. Baull was unsure if he was black r white.


Mr. Baull then described the other two     males. One was approximately 5' 2' to 5' 3', mall or thin build. He added that he was holding a small baseball bat. Mr. Baull described he baseball bat as a souvenir type bat. Mr. Baull then stated that the third male had a andgun and held  him around the neck, and placed it to the back of his neck. Mr. Baull stated hat the male who was holding him told him to call the manager outside, so he called for Mr.

Johnson.

A-56

State of Delaware
COUNTY OF SUSSEX
Complaint No. 07-02-4670

In The Matter of:
Jarid L. Cubbage  SBI# 00271683
Black Male born on May 19, 1972
238 Clover Street
Salisbury, MD  21804
1998 Toyota Camry Gold in color
DE Reg.  194705
VIN#  4T1BG22K2WU291516

SS:

**Search Warrant Return**

State of Delaware

County of Sussex

Pursuant to the attached search warrant, which was executed on the 11th day of February 2002 at 1500 hours, the following items were seized and viewed by Judge _Herman G. Hagan_ on this 18th day of February 2002 at _0831_ hours.

| No. | Description | Time | Location |
|-----|-------------|------|----------|
| 1 | 1 red head bandana | 1510 | Trunk of Vehicle |
| 2 | 1 black head bandana | 1510 | Trunk of Vehicle |
| 3 | 1 pair of white Rebok sneakers | 1510 | Trunk of Vehicle |
| 4 | 1 black t-shirt | 1520 | Rear Seat of Vehicle |
| 5 | 1 black pullover shirt | 1520 | Rear Seat of Vehicle |
| 6 | 1 black glove | 1520 | Rear Seat of Vehicle |
| 7 | 1 light blue head bandana | 1525 | Front Passenger Seat of Vehicle |
| 8 | 1 dark blue head bandana | 1525 | Front Passenger Seat of Vehicle |
| 9 | 1 pair of black gloves | 1525 | Front Passenger Seat of Vehicle |

Warrant executed and returned by    Det. Douglas B. Hudson  4216

Signed _____        Signed _____

Sworn to and subscribed before me this _____18th_____ day of _February_, 2002

Judge/Commissioner _____

A-57

A-50

JOHNSON - DIRECT

1          THE COURT:  You may, yes.

2    BY MR. ADKINS:

3      Q.   I am going to hand you A for Identification

4    and don't point it at anybody.  With the exception of

5    that trigger lock on there, does that look like the

6    gun you described earlier in your testimony?

7      A.   Similar to what I described.

8      Q.   Thank you.

9          MR. ADKINS:  Your Honor, I would like to have

10   this next item marked as State's Exhibit B for

11   Identification.

12         THE COURT:  Yes, sir.

13         THE CLERK:  Marked as State's B for

14   Identification.

15         MR. ADKINS:  I request permission to approach

16   the witness and hand him this item?

17         THE COURT:  Sure.

18   BY MR. ADKINS:

19     Q.   I want to hand you B for Identification and

20   ask you to take a look at it.  I ask you if that looks

21   like the bat you described was used that night?

22     A.   Yes, it does.

23     Q.   Thank you.  You said that you knew Jarid

LEWIS - Direct

1      A    Yeah.

2      Q    Have you ever seen this before?

3      A    Yeah.

4      Q    Where have you seen this before?

5      A    It's mine.

6      Q    It's yours?

7      A    Yeah, it's a T-bat.

8      Q    T-bat.  When did you get this T-bat?

9      A    That day of the night before the robbery,

10   the night during the robbery.

11     Q    Where did you get it from?

12     A    Wal-Mart.

13     Q    Do you remember about what time of the day

14   you got it from Wal-Mart?

15     A    I don't know exactly what time.  It was

16   after six.

17     Q    Was anybody with you when you got the bat?

18     A    Cubbage.

19     Q    Do you know who bought the bat?

20     A    I bought the bat.

21     Q    Can you tell us why you bought the bat?

22     A    Because we was supposed to go to the club,

23   but that is not the reason because we had -- it was

B-9

LEWIS - Direct

1    like school-type thing from Cape.  They had a little

2    problem with each other.

3        Q    It wasn't in connection with the Burger King

4    thing; is that correct?

5        A    Not at all.

6        Q    What did you do after you went to the Dollar

7    General?

8        A    We all got out of the car and walked to the

9    back of the Burger King.

10       Q    Let's stop there.  When you left, did all

11   three of you leave the car?

12       A    Yeah.

13       Q    When you left the car, did anybody have that

14   bat?

15       A    I had the bat first.  Yeah, I had the bat

16   first.

17       Q    And did anybody have any type of a gun?

18       A    William Wilson had a gun.

19       Q    I'm going to show you A for identification.

20   Do you recognize this gun?

21       A    Yeah.

22       Q    When did you ever see this gun before?

23       A    It was when Wilson had it that night.

CHRISTINE L. QUINN
OFFICIAL COURT REPORTER

Not Reported in A.2d, 2005 WL 914470
**(Cite as: Not Reported in A.2d)**

*Claim 3*

The State used false evidence to gain a conviction
Prosecutor Adkins submitted pictures of doorags and gloves plus the actual items as evidence used in the Burger King robbery when he knew that the State didn't possess any physical evidence against the defendant.

This argument of defendant's is confusing. I will, however, summarize it as best I can.

First, he argues that the following colloquy from preliminary hearings *establishes* the State had no physical evidence against him:
Q. So, was the gun and the bat tested for any sort of fingerprint evidence?
A. It's in the process of that now, sir. I don't know if it's been done yet.
Q. Okay. And so the only evidence that you really have against Mr. **Cubbage** is the statements by the two codefendants; is that correct?
A. Yes. Plus that matches up with the only people at the crime scene who would have known certain elements of what happened if they were there.
Q. You are circumstantially correct, but as far as any physical evidence or identification the only thing you have are the codefendants' statements; correct?
A. Yes, sir.
Transcript of Preliminary Hearing in *State v. Cubbage,* dated February 28, 2002, at 16. FN7

FN7. The context of the questioning allows for the inference that the Detective was stating he did not have identifying evidence against defendant, such as DNA or fingerprints. However, I will assume the Detective was stating he did not have any physical evidence in the case at that time. This assumption is illogical in light of the fact that the masks, gloves, BB gun and bat had been located by the time of this statement. However, I make this assumption for purposes of resolving the pending Rule 61 motion.

Defendant maintains that because the State had no

evidence, it could not produce the photographs of the doo-rags and three black gloves unless the State introduced them through the, defendant, a codefendant or a witness, who must have identified that evidence. Otherwise, the evidence was false and inadmissible. He wraps up his argument as follows:
The admitted evidence prejudiced the defendant because the State couldn't connect the items entered into evidence with the crime committed and the jury speculated that the defendant was guilty because the defendant possessed the means to commit the crime.

*13 To survive the procedural bar, defendant must establish ineffective assistance of counsel with regard to this claim. Trial counsel was not ineffective for failing to object to the admission of the evidence; there was no ground for objecting. Defendant's premise fails. The Detective's statement at the preliminary hearing did not render any other evidence "false". The State identified the photographs in its discovery responses dated April 25, 2002. The State properly obtained the admission of the photographs. Since trial counsel was not ineffective, this claim fails.

*Claim 4*

Prosecutor solicited false testimony from Det. Hudson
Det. Hudson testified falsely at trial when he said the bags of items was evidence but eight months prior to trial, he testified that the only evidence he had against the movant was the statements of the codefendants.

Defendant again argues that the above-quoted passage from defendant's preliminary hearing establishes that, besides the statements of the co-defendants, all "evidence" and testimony entered in his case was false and the product of perjury.

This claim is procedurally barred unless the ineffective assistance of counsel claim constitutes cause for relief from that bar.

Even if I assume the Detective's statement actually

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

A-61

LEWIS - Direct

1      Q    Did the three of you have anything covering

2    your faces?

3      A    I had a T-shirt across, like, my nose.  I

4    don't really remember what Wilson had on, but Cubbage

5    he had some kind of black ski mask.

6      Q    And can you tell us what the plan was?

7      A    He just was like when -- he knew what time

8    they took trash out.  So he was like when Jason comes

9    out with the trash, tell him to call the manager out,

10   call the manager out, just walk him toward the back

11   of Burger King, and that's what we did.

12     Q    So when you got up, they're really close to

13   the Burger King, was there ever any switch of who had

14   the bat and who had the gun?

15     A    Cubbage was like you all switch, and we

16   switched.  Then I had the gun, and Wilson had the

17   bat.

18     Q    Did you see Jason come out with the trash?

19     A    Yeah.

20     Q    And where did Jason go?

21     A    To the trash Dumpster, throw the trash away.

22     Q    Then what did Jason do?

23     A    He coming back.

A - 64

A-31

JOHNSON - DIRECT

1    did the door swing?

2         A.    To the right.

3         Q.    Is that the same location of the third

4    individual by the utility box?

5         A.    Yes, it was.

6         Q.    How was that individual dressed?

7         A.    All in black as well.

8         Q.    Did any of these people have anything

9    covering their face?

10        A.    They all had masks.

11        Q.    Do you know if any of these people had gloves

12   or anything covering their hands?

13        A.    The one witness standing by the power box had

14   gloves that I could see clearly.

15        Q.    Did the individual with the gun or the

16   individual with the bat speak?

17        A.    The one with the baseball bat spoke.

18        Q.    What did he say?

19        A.    Somewhere along the lines of calling out the

20   other person's name and saying:  Watch your ass.

21        Q.    What name did he say?

22        A.    Daron.

23        Q.    And do you recall the one with the gun,

HUDSON - Direct

1    black one, a light blue one, and a dark blue one.

2         MR. BRADY:  Your Honor, if I may approach

3    with this evidence bag.

4         THE COURT:  Yes.

5         MR. BRADY:  Your Honor, may I approach to

6    have them marked for identification purposes?

7         THE COURT:  Sure.  Mr. Adkins, do you have

8    any objection to these?

9         MR. ADKINS:  No, Your Honor.

10         MR. BRADY:  Do them as Defendant's

11    Exhibits 2 and 3.  I believe we have a defendant's

12    exhibit already in.

13         THE CLERK:  That's just for I.D.

14         MR. BRADY:  Okay.  That's fine.

15         THE CLERK:  Admitted as Defense Exhibit

16    No. 1.  Admitted as Defense Exhibit No. 2.

17    BY MR. BRADY:

18      Q    Detective, did you ever show the doo-rags

19    to Michael Johnson to identify them, if he could

20    see if they were involved in his description?

21      A    No, sir.

22      Q    Did you ever show the gloves that were

23    introduced as State's exhibits this morning to

KATHY S. PURNELL
OFFICIAL COURT REPORTER

HUDSON - Direct

1    Mr. Johnson?

2        A    No, sir.

3        Q    And it's your testimony there was another

4    doo-rag, to the best of your knowledge, found?

5        A    Yes, sir.  It's in one of those bags, I

6    believe, sir.  It might be still in that box.  Can

7    I stand up?

8            MR. BRADY:  Your Honor, can the witness

9    stand up to go through the box?

10            THE COURT:  Yes.  Sure.

11            THE WITNESS:  There is a black bandana in

12    here.  That was along with the red and white one.

13            MR. BRADY:  May I have this marked for --

14            MR. ADKINS:  No objection.

15            THE COURT:  It's admitted then.

16            THE CLERK:  Admitted as Defense Exhibit

17    No. 3.

18    BY MR. BRADY:

19        Q    Further in the evidence box you have a

20    pair of sneakers that you referenced earlier, is it

21    not, sir?

22        A    Yes, sir.

23        Q    And they were sneakers you recovered from

Cubbage – Cross                    D-42

1    trial, we get that, and I was going to ask him, "Why

2    didn't you tell the police when you were being

3    interviewed about your alibi as to where you were?"  I

4    won't go there if, in the opinion of the Court, that

5    somehow infringes upon his privilege.  But he has

6    already, in an interview, waived his Miranda and

7    voluntarily talked about this subject.  It seems a

8    natural place for me to go on cross-examination.

9         MR. BRADY:  Your Honor, he is right.  He

10   waived his Miranda right.  Before you get upset, I am

11   not saying it wasn't voluntarily.  He said, "You ask

12   questions.  I will answer them."

13        Never in that interview did Detective Hudson

14   ever say, "Well, where were you then if you were not

15   robbing the Burger King?," or "Tell me where you were

16   so I can check it out."  He asked him, "I am under

17   arrest?"  "Yes."  Then he said, "You are going to take

18   me to jail?"  "Yes."  Then, "Take me to jail."

19        THE COURT:  Well, post-arrest silence

20   generally comes with a situation where you have an

21   assertion of rights.  Here you have the rights given

22   and waived in an interview.  He is told in the

23   interview that he is a suspect of this incident, and

Cubbage – Cross                D-43

1    yet he fails to mention in the interview that he is

2    with his girlfriend, which is an alibi that is being

3    offered at trial.  So if your objection is on some kind

4    of constitutional post-arrest silence basis, it is

5    overruled, because that is out.  He waived his rights.

6              MR. BRADY:  He waived his rights, but

7    Detective Hudson never asked him or gave him the

8    opportunity.  You remember at the end, "Well, I am

9    going to shut the tape off."

10             THE COURT:  Maybe on redirect examination you

11   can ask him, "Did Mr. Hudson ever ask you that

12   question?"

13             MR. BRADY:  All right.

14             THE COURT:  That is usually the way that is

15   handled.  This is not the first time this has happened.

16   I mean, the way it has been handled before is people

17   say, "I didn't give that explanation because I wasn't

18   asked about it," but it is still fair game to ask.

19             MR. BRADY:  I would like also to recall

20   Detective Hudson.

21             THE COURT:  Yes.

22             MR. BRADY:  I already called him and released

23   him.

EILEEN G. KIMMEL
OFFICIAL COURT REPORTER

A- 67

Cubbage - Cross                    D-44

1          THE COURT:  He is here.  He is not going

2    anywhere.

3          MR. BRADY:  Thanks.

4          (Whereupon, counsel returned to the trial

5       table and the following proceedings were had:)

6    BY MR. ADKINS:

7       Q    Mr. Cubbage, also in that interview with

8    Detective Hudson, he directly accused you of doing this

9    robbery with Daron Lewis and William Wilson, didn't he?

10      A    Yes.

11      Q    You knew you were a suspect; correct?

12      A    Yes.

13      Q    You knew you were about to get arrested;

14   correct?

15      A    I was already arrested.  He told me once at

16   Burger King and told me once before he turned on the

17   tape.  Then he told me once during the tape.  So I

18   already knew I was arrested.

19      Q    He gave you an opportunity to talk about

20   this; correct?

21      A    What do you mean?

22      Q    Well, to explain yourself?

23      A    No.  He asked me questions about the robbery.

EILEEN G. KIMMEL
OFFICIAL COURT REPORTER

A-68

Cubbage — Cross                     D-45

1    He never asked me where I was that night, no.

2        Q    So did you ever think, right then and there

3    at that time, during that interview, to tell Detective

4    Hudson, "I was with this Trineina girl.  Here is her

5    phone number.  Call her.  She will confirm it.  Let me

6    go"?  Did you think of doing that?

7        A    Yeah.

8        Q    Why didn't you?

9        A    Because he already said that I did it, he

10   knew I did it, and that's why I did not tell him,

11   because he already had his mind set that I was guilty.

12   He is not the judge or the jury.  I deal with them.  So

13   that is why I told him, "Take me to jail.  If you are

14   so convinced I am guilty, then take me to jail."

15       Q    So you chose to wait to tell about where you

16   were; correct?

17       A    I would rather talk to a lawyer.  He is not a

18   lawyer.

19       Q    How long have you had this relationship with

20   Trineina?

21       A    Well, it never ended.  So it is still on-

22   going.  So it has been a little over two years.  But I

23   didn't start physically seeing her until after I was in

Hudson – Direct/Cross                    D–52

1    Whereupon,

2                    DOUGLAS HUDSON

3    resumed the stand as a witness recalled by and on

4    behalf of the defendant and, having been previously

5    duly sworn, was examined and testified further as

6    follows:

7                    DIRECT EXAMINATION

8    BY MR. BRADY:

9        Q    Detective Hudson, when you did the taped

10   interview of Mr. Cubbage, he was already under arrest;

11   is that correct?

12       A    Yes.

13       Q    Regardless of what he said that night, he was

14   going to be processed for those charges; correct?

15       A    Yes, sir.

16       Q    Did you ever ask him where he was that night?

17       A    I don't think I did.

18            MR. BRADY:  No further questions, Your Honor.

19                    CROSS–EXAMINATION

20   BY MR. ADKINS:

21       Q    Did you make it clear to him that you were

22   accusing him of participating in the robbery, and on

23   that specific date and time, being at Burger King in

Hudson – Redirect                     D-53

1   Rehoboth on Route 1 with William Wilson and Daron

2   Lewis?

3        A    Yes, sir, I did.

4        Q    And did he offer any explanation as to his

5   being elsewhere or with someone else?

6        A    No, sir, he didn't.

7                       REDIRECT EXAMINATION

8   BY MR. BRADY:

9        Q    To the best of your recollection of what you

10  asked him on that tape, did you tell him the time when

11  it was alleged to have taken place?

12       A    I don't recall if I did or not.

13            MR. BRADY:  No further questions, Your Honor.

14            If I may have a moment?

15            THE COURT:  Yes.

16            MR. BRADY:  I am done with Detective Hudson,

17  Your Honor.  I am sorry.  He did not have to stay up

18  there.

19            THE COURT:  Thank you.

20                            (Witness steps down.)

21            MR. BRADY:  The defense rests.

22            MR. ADKINS:  May I have a moment, please?

23            Your Honor, I have no further evidence to

                    EILEEN G. KIMMEL
                  OFFICIAL COURT REPORTER
                        A 71

D-124

1    Burger King?  It is an indication, under the evidence,

2    of culpability.

3                Then, again, as with his intimate friend,

4    Trineina Parsons, although Detectives Hudson is

5    interviewing him, accusing him of being at that Burger

6    King and involved in that robbery on that date, at that

7    time, he doesn't offer to say, "No, I was with

8    Trineina.  Here's her number.  Call her.  I am out of

9    here."  Why?

10               I want to say just a little bit about the

11   charges and accomplice liability.  As the Judge has

12   told you in the instructions already, there is a thing

13   called accomplice liability.  That is when a person

14   intends to aid another person in committing some or all

15   the acts necessary for the commission of the offense.

16               A person is guilty of an offense committed by

17   another person when, intending to promote or facilitate

18   the commission of the offense, he aids, counsels,

19   agrees to aid the other person in planning or

20   committing it.  That has applicability to the robbery

21   in the first degree in this case for the following

22   reasons:

23               Count 1 of the Indictment, in the elements of

Superior Court of the State of Delaware, _Sussex_ County

# PLEA AGREEMENT

State of Delaware v. _David J. Arthur_

Case No(s): _0202007680_ Cr.A.#s: _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 thru 0613_ : _____-0268_

☐ Title 11 HAB. OFFENDER: _____     ☐ BOOT CAMP ELIGIBLE     ☐ INELIGIBLE
☐ RULE 11(e)(1)(C) — If out of guideline, reason is as follows: _____
☐ Title 11, §4336, sex offender notification required     ☐ Title 11, §9019(e), forensic fine ☐ $100(F), ☐ $50(M)

**Defendant will plead guilty to:**

| Count | Cr.A.# | Charge | [LIO if applicable] |
|---|---|---|---|
| 1 | 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 | Robbery 1st Degree | 2-20 yrs L5 |
|  |  |  | guideline 2-10 yr L5 |
| 2 | 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 | Conspiracy 2nd degree | 0-2 yr L5 |
|  |  |  | guideline up to 12 mo L2 |
| 3 | 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 | PDWDCF | 2-20 yrs L5 |
|  |  |  | guideline 2-5 yr L5 |

Upon the sentencing of the defendant, a **nolle prosequi** is entered on ☒ the following charges/☐ all remaining charges on this indictment:

| Count | Cr.A.# | Charge |
|---|---|---|
| 4 | 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 | Wear. Disguise Dur. Com. of Felony |
|  |  |  |

(SUM = 4 YRS w/ CREST INSIDE )

**Sentence Recommendation/Agreement:**     ☒ PSI    ☐ Immediate Sentencing
CT 1 /0611/ ROBBERY 1ST - 7 YRS L5 AFTER 2 YRS L5 THE BALANCE IS SUSPENDED
FOR 5 YRS L3    -    CT 2/ 2 YRS L5 SUSPENDED FOR 2 YRS L2
CT 3 /0268/ PDWDCF - 7 YRS L5 AFTER 2 YRS L5 & SUCCESSFUL COMPLETION
L5/KEY THE BALANCE IS SUSPENDED FOR 12 M L4 /CREST UPON COMPLETION CREST
BALANCE L4 to. 4 YRS L3
**State and Defendant agree to the following:**
☒ Restitution: _Pro Rata per calc Share of restitution to victim Jimmie Ingram_
☒ No _____ contact w/ _Jimmie Ingram, mother & Ryan Ingram_
☒ Other Conditions:
FORFEIT ALL EVID
_____
_____
_____

DAG: _ADAM D. GELOF_          DEF. COUNSEL: _____
        PRINT NAME                                          PRINT NAME

_[signature]_                                   _____
     SIGNATURE                                          SIGNATURE

                                           DEFENDANT: _____
Date: _____

XC: Attorney for Defendant, Defendant          Page ___ of ___
     Attorney General, Attorney General Worksheet

A-73

IN THE COURT OF COMMON PLEAS FOR THE STATE OF DELAWARE

IN AND FOR SUSSEX COUNTY

| | | |
|---|---|---|
| STATE OF DELAWARE | ) | Criminal Action No. |
| | ) | 0202007080 |
| vs. | ) | |
| | ) | |
| JARID L. CUBBAGE, | ) | |
| | ) | |
| Defendant. | ) | February 28, 2002 |

- - - - -

BEFORE:

COMMISSIONER JOSEPH W. MAYBEE

- - - - -

APPEARANCES:

JAMES W. ADKINS, Esquire
Deputy Attorney General,
on behalf of the State,

THOMAS D. H. BARNETT, Esquire,
on behalf of the defendant.,

TRANSCRIPT OF PRELIMINARY HEARING

LINDA A. LAVENDER
Official Court Reporter

A-74

HUDSON - Cross

1      Q      Did you ever find out who Joselle was?

2      A      No, sir.

3      Q      Did you ever recover the Bank of Delmarva

4   bank bag?

5      A      No, sir.

6      Q      Did you check and see what type of bank

7   accounts Mr. Cubbage had to see if he had any

8   deposits, $1407 or $522 or anything like that, in

9   the period from when the robbery took place until

10  the time you arrested him Sunday afternoon,

11  approximately 3:00 p.m.?

12     A      No, sir.

13     Q      Never found the money?

14     A      No, sir.

15     Q      You were in the courtroom the other day

16  when I think Billy testified about the type of

17  covering he had over his face, were you not?

18     A      William Wilson, yes, sir.

19     Q      Yes.  And I believe he demonstrated how

20  the doo-rag was tied, did he not?

21     A      Yes, sir.

22     Q      Do you recall taking a statement from

23  Mr. Lewis?

HUDSON - Cross

1     A    Daron Lewis?

2     Q    Daron Lewis, about the clothing that the

3  individuals were wearing.

4     A    Yes, sir.

5     Q    And do you recall testifying about that

6  clothing at a hearing on February 28th, 2002?

7     A    I remember testifying, but I don't

8  remember what I said.

9     Q    And do you further recall testifying that

10  day that Mr. Lewis' version corresponded to what

11  Mr. Johnson and the other witness told you?

12     A    Can you repeat that question, please?

13     Q    Sure.  With regard to the clothing, or the

14  disguise that was being worn by the individuals, do

15  you recall if you answered a question that day that

16  the witness, Mr. Johnson, indicated to you that

17  that was similar to what Mr. Lewis had said about

18  the clothing?

19     A    I don't remember that specific question.

20     MR. BRADY:  Your Honor, may I approach

21  with this?  I've shared it with --

22     THE COURT:  Yes.

23     THE WITNESS:  Is this at the preliminary

81

HUDSON - Cross

1    hearing?

2    BY MR. BRADY:

3        Q    Yes.

4        A    At Jarid Cubbage's preliminary hearing?

5        Q    Yes.  If you turn to the front cover, it

6    indicates that.  And the question asked by Mr.

7    Adkins is?

8        A    The "Q" here indicates a question by Mr.

9    Adkins?

10       Q    That's correct, Detective.

11       A    Yes, sir.

12       Q    Okay.  Does that refresh your recollection

13   of those questions that Mr. Adkins asked you at the

14   preliminary hearing?

15       A    There again, I must have said this, but I

16   don't remember specifically saying it.

17       Q    But without that document in front of you,

18   you're not going to be able to recall the question

19   or answer, is that correct?

20       A    No, sir.

21       Q    Could you read the question of Mr. Adkins

22   and then your answer, starting with the next to the

23   last "Q" on the bottom of that page?

HUDSON - Cross

```
 1      A     Yes, sir.  The question is, "Okay.  And
 2   did you also, you also discussed in your testimony
 3   whether any or all three were wearing a disguise on
 4   the occasion of this offense and what kind of
 5   disguise?"
 6           Answer.  "Yes.  Mr. Lewis stated they had
 7   on all black clothing and had a shirt over his
 8   face.  Said that Mr. Wilson and Mr. Cubbage had on
 9   black, possibly neoprene-type ski masks."
10      Q     And the next question?
11      A     "Okay.  And did these versions coincide
12   with the --"
13      Q     I'm going to ask you to use the word
14   complaining witness instead of what is typed there
15   on the next page.
16      A     Okay.  Question.  "Okay.  And did these
17   versions coincide with the complaining witnesses'
18   version to you?"  Answer.  "Yes, sir."
19           MR. BRADY:  Your Honor, may I approach and
20   retrieve?
21           THE COURT:  Yes.
22   BY MR. BRADY:
23      Q     So with regard to the doo-rag that has
```

HUDSON - Cross

1    been introduced as red and white, that is not

2    consistent with what Mr. Lewis or the complaining

3    witnesses told you about what was covering

4    Mr. Wilson's face at the time of the offense, is

5    that correct, Detective?

6        A    That is correct, sir.

7        Q    How many doo-rags specifically did you

8    find in Mr. Cubbage's vehicle?

9        A    There is a red and white one, a blue one,

10   possibly a black one or dark blue one.  I think

11   that's it.  Three.

12       Q    Did you ever find any of the -- I'll

13   probably mispronounce it here -- the neoprene-type

14   ski masks that were referenced by Mr. Lewis?

15       A    No, sir.

16       Q    Did you inquire of the people who were

17   there at the scene, including the owners when they

18   arrived, regarding any possible videotapes that may

19   have been maintained at the Burger King?

20       A    Yes.  I spoke with both owners, Mr. Jack

21   Griffith, I believe his last name is, and Mr. Jim

22   Hautala.  They told me that all video equipment was

23   not functioning at that point.

D-115

1    what is worthy of belief and what is not?

2            Let's look at Trineina Parsons.  You are

3    going to decide whether what she had to say -- it is

4    necessary to make your decision.  You are going to have

5    to decide whether what she had to say is accurate.  She

6    testified that she was an intimate friend of his for

7    one or two years.  They were so intimate that they

8    would have sex together.  He had done things for her

9    when she needed money.  Given her money.  If she needed

10   something, he would give it to her, and if he needed

11   something, she would give it to him.  He is a man in

12   need in this situation.

13           Also, despite the fact that she knew,

14   according to her testimony, within one week after he

15   was arrested that they had the wrong man and she had an

16   alibi for him, she doesn't even tell the police.

17           How about the defendant?  You have to weigh

18   his testimony.  What are you going to use to do that?

19   What do we know about him?  Well, the next thing I am

20   going to say should be used for the sole purpose of

21   weighing credibility of testimony.  He is a convicted

22   felon.  He has been convicted of robbery, a crime of

23   dishonesty, and that --

EILEEN G. KIMMEL
OFFICIAL COURT REPORTER

A-80

D-123

1    regain your train of thought, that is fine, too.

2            MR. ADKINS:  Thank you very much, Your Honor.

3            (Whereupon, counsel returned to the trial

4        table and the following proceedings were had::)

5            MR. ADKINS:  We were talking about the fact

6    that you are going to need to weigh the testimony of

7    the defendant.  You are going to have to decide whom

8    you believe.  And what are you going to look at when

9    you are assessing his credibility?

10            I was saying about how he said on the stand

11    that he had a prior conviction of a felony.  You have

12    an instruction from the Judge about that.  Whether you

13    consider that in assessing his credibility, you know

14    that in the tape where Detective Hudson interviewed

15    him, Detective Hudson started asking, "Well, you know,

16    really, all we want is this money back."  There is a

17    discussion as to how much.  He said, "Two thousand

18    dollars."  The defendant says, "I can get two thousand

19    dollars."

20            If he didn't do this, if he is not guilty,

21    why is he offering to pay two thousand dollars to get

22    this thing resolved?  To pay two thousand dollars of

23    his money if somebody else committed this robbery of

D-120

1   here, but it had nothing there about the felonies.  I

2   apologize, Your Honor.  I thought it did.

3             MR. ADKINS:  Isn't that a generic issue?

4   Can't that be made to apply to any witness?  I don't

5   know how it is, but it is any witness can be convicted

6   of a felony or crime of dishonesty or all witnesses who

7   have testified.

8             THE COURT:  What I can do is take the

9   co-defendants' convictions of a felony and I can

10  broaden that.  I can read to them, after you are done

11  with arguments, the fact that William Wilson and Daron

12  Lewis were convicted of felonies and that could be used

13  in judging their credibility.  I could broaden "a

14  felony" to "a crime of dishonesty".

15            MR. ADKINS:  As long as that doesn't confuse

16  the jury and make them think that that means a prior

17  offense other than these offenses.

18            THE COURT:  For which they pled guilty?

19            MR. BRADY:  Right.

20            MR. ADKINS:  Yes, because they didn't have

21  any record.

22            THE COURT:  They both pled to robbery?

23            MR. ADKINS:  Robbery second and wearing a

EILEEN G. KIMMEL
OFFICIAL COURT REPORTER

A-82

1-18-03

A-83

Mr. Brady:

I've made a mistake when I told you that I didn't want you to do my appeal but by law you have, to do it. I sincerely hope that you didn't file the motion without first informing me. I am suppose to be notified of all decesions you make on my behalf in regards to my case; so saids Delaware Rule Annotated Vol. 2, Rule 1.4 Communication. I have a list of grounds that I would like for you to argue on my behalf as well as any arguements that you may have that differ from the ones I have. The first two arguements, although you did not object to them at trial as I had asked you, they still can be raised on my appeal because (1) I was prejudiced when the State introduced into evidence, William Wilson's oral statements with Det. Hudson that he wore the red/white derag during the robbery as a disguise which was seized from my car and (2) I also was prejudiced when the State offered into evidence dorag's, gloves and black shirts as disguises used in a robbery that they could not link to the Burger King robbery. The State didn't ask any of the State witnesses who were directly involved in the robbery as a participant or a complaining witness about any of the items they introduced into evidence as disguies that were seized from my Toyota Camry. That left the jury to speculate and evidence that is speculative carries the potential for permitting the jury to draw unwarranted inferences. Admissibility is barred because speculation creates prejudice. I mailed you five motions in September to file on my behalf and those motions were for a suppression hearing, evidence hearing and to receive William Wilson's statements from the State. I also mailed the same motions to Superior Court, so if the State still argues that I waived the right to challange the entries on appeal, you can argue Gregory vs. State Del. Spr. 616 A.2d 198, "the motion to suppress standing alone preserves the issue on appeal." I ask that you argue some Federal case laws with my appeal. If you have completed the appeal already, I ask that you amended it and file a new appeal with my listed arguements. I also want a copy of the amended appeal

...ind the previous appeal was filed. I want you to send me a copy as soon as you receive this letter. I hope you respond to this letter because I've written five times since September and yet to have received a letter from you.

Thank you
Jim L Carlson
271685

State failed to disclose relevant Statements of Codefendant which is a violation of Delaware Superior Court Criminal Rule 16
- Johnson vs State Del Supr. 550 A.2d 903   - Ray vs State Del Supr. 587 A.2d 439
- Skinner vs State Del Supr 575 A.2d 1108

It was an error in admitting into evidence doorags, gloves and shirts that had no established nexus to the offense charged
- Farmer vs State Del Supr. 698 A.2d 946

There was an irreconcilable conflict in the State's case concerning the defendant's guilt
- Bland vs State Del Supr. 263 A.2d 286
- Saunders vs State Del Supr. 401 A.2d 629   - State vs Thomas et al, 6 Terry 385. 75 A.2d 218

There was insufficient evidence to support the jury's verdict

State failed to establish a prima facie case

Trial Judge erred in not granting a judgement of acquittal

Trial court erred in allowing impeachment with prior conviction
- Fennel vs State Del Supr. 691 A.2d 624

Trial court erred in allowing jury Foreman to remain on panel after it was disclosed that jury foreman and owner of Burger King James Hartala, whose restaurant was robbed are neighbors and that owner asked for $17,000 dollars in restitution when only $1929.03 was stolen.

A - 83

trier of fact could have found the defendant guilty beyond a reasonable doubt. Fawcett v. State, Del.Supr 697 A.2d 385 (1997). In this case, there is not credible eyewitness testimony that Cubbage robbed the Burger King. In fact the individual with the best possible vantage point, Johnson, the night manager, told the police that the third suspect was wearing a mask. The two co-defendants combine to provide contradictory and uncorroborated evidence that is greatly impaired by self-interest. Further, should the Court find there was sufficient evidence to believe that Cubbage was the third suspect, the defendant incorporates those arguments made previously with respect to the trial Court's denial of the Motion for Judgement of Acquittal that there was insufficient evidence to believe he was guilty of Possession of a Deadly Weapoon during the Commission of a Felony, Conspiracy 1st and Wearing a Disguise during the Commission of a Felony. Further, the testimony of Johnson was that the three subjects were wearing black headgear, while at trial, Wilson testified that he wore a red and white do-rag (A-36), and Lewis testified that he covered his head with a shirt (A-37). No one ever identified the other do-rags as being involved in the robbery. Further, Detective Hudson could not produce the notes of his preliminary hearing conversation with Wilson (A-38). In total, the evidence